**BRIDGEPORT BRASS CO. v. BOSTWICK LABORATORIES, Inc., et al.**

No. 160, Docket 21550.

United States Court of Appeals
Second Circuit.

Argued Feb. 1, 1950.

Decided April 5, 1950.

Marsh, Day & Calhoun, Bridgeport, Conn., Kenyon & Kenyon, New York City, Ralph L. Chappell, New York City (George T. Bean, New York City, John S. Dawson, Bridgeport, Conn., of counsel), for appellant.

Rockwell & Bartholow, New Haven, Conn., Pennie, Edmunds, Morton & Barrows, New York City, W. B. Morton, Jr., New York City (W. Brown Morton, New York City, of counsel), for appellees.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a summary judgment dismissing a complaint, filed on February 25, 1940, charging infringement of two patents, Nos. 1,892,750 and 1,945,998, the chief commercial use of which has been in the manufacture of "aerosol bombs." The original applications for both of them were filed on November 12, 1928; they were issued on January 3, 1933 and February 6, 1934, respectively, to Erik Rotheim; and they were subsequently assigned to the appellant, the Bridgeport Brass Co. The first, No. 1,892,750, covers both a method and an apparatus "for atomizing materials" and the second, No. 1,945,998, is for a "coating composition." They will herein be referred to, respectively, as the "first Rotheim patent" and the "second Rotheim patent."

Appellee's answer was filed, and its motion under the 56th Civil Rule of Procedure, 28 U.S.C.A., for a summary judgment dismissing the complaint was made, on the same day, March 2, 1949, each asserting that the patents in suit were anticipated by the following expired patents: Helbing, No. 628,463, July 11, 1899; Pertsch, No. 628,489, July 11, 1899; Gebauer, No. 668,-815, February 26, 1901; and Gebauer No. 711,045, October 14, 1902. Appellee, relying exclusively on the disclosures made in the earlier patents, submitted no affidavits in support of its motion. Appellant however, filed two affidavits in opposition to the motion, one of them setting forth the claimed differences between the patent in suit and the prior art. The court below nevertheless held that the first Rotheim patent was anticipated by the Helbing and the two Gebauer patents, and the second Rotheim patent by the Helbing patent; found that there was presented no "genuine issue of fact"; and, therefore, granted the motion.

It is clear that under Rule 56, as a prerequisite to granting a motion for a summary judgment, there must be "no genuine issue as to any material fact." This rule, of course, is as applicable in patent cases as elsewhere, Engineering Development Laboratories v. Radio Corporation of America, 2 Cir., 153 F.2d 523, and means simply that if liability is dependent upon any disputed questions of fact, the party opposing the motion has the right to have those questions determined upon a trial. Thus, we direct our inquiry to the question whether the earlier patents disclosed fully, in and by themselves, the al-

leged inventions described in the patents in suit, or whether further examination of the relevant art is needed to determine that.

Inasmuch as the first and second Rotheim patents are inter-related, as are the Pertsch and Helbing patents, and since the appellees rely upon all the patents above mentioned as anticipating the first Rotheim patent and only the Helbing and Pertsch patents as anticipating the second Rotheim patent, a consideration of the patents in their order of issuance will, perhaps, be most helpful.

Helbing, No. 628,463, was for "coating and insulating materials for medical purposes," and claims, as new articles of manufacture, "ethyl chlorid containing collodion dissolved therein" and "an alkyl chlorid having a boiling point at or below 38° centrigrade containing collodion dissolved therein." The specifications point out that alkyl chlorids, with or without the addition of ether or alcohol to facilitate solution, are able to dissolve and hold in solution various gums, resins, fatty matters, wax, and the like, such as are used in the production of collodion and traumaticin. They go on to state that when such substances are dissolved by those alkyl chlorids having a boiling point below 38° centrigrade— namely methyl and ethyl chlorides—and the solution is placed in a glass or metal vessel having a suitable orifice and cap and hermetically sealed, the heat of the hand holding the vessel will cause the ethyl or methyl chlorid to begin to evaporate. This in turn causes internal pressure and when the cap is removed the solution is thereby ejected "in a fine jet or spray." The methyl or ethyl chlorid will then evaporate, it is said, leaving the gummy or fatty matter deposited in a uniform coat on the desired surface. The specifications further point out that alcohol or ether may be added to the solution to increase solubility of the gummy or fatty matter being sprayed, "as will be well understood by chemists." And they also state that the solution is particularly useful where it is desirable to form a protecting-coat to human tissue, as the "ethyl or methyl chlorid is a local anesthetic."

Pertsch, No. 628,489, pointed out that this last is true, because of the generation of cold due to the rapid evaporation of the readily volatizable methyl or ethyl chlorid, but that the anesthetic effect lasts for only a very short time. The invention disclosed and claimed was the addition to that liquid of a slow-acting anesthetic substance such as cocaine, resulting, it was claimed, in a longer period of anesthesia. The method of application specified is the same as Helbing's, that is, by way of a glass or metal vessel with suitable outlets to which is applied the heat of the hand, causing internal pressure resulting from the volatile liquid's partial evaporation in the container.

The first Gebauer patent, No. 668,815, disclosed and claimed a receptacle for administering volatile liquids. The receptacle consisted of the combination of a vessel containing the liquid to be sprayed, and valve passages leading from the vessel and connecting by way of a capillary opening to a nozzle, the nozzle having an expansion chamber immediately behind the ultimate point of discharge. The liquids to be used, it was specified, were those having a low enough boiling point to permit their partial evaporation within the vessel and consequently the creation of a pressure therein, through the application of the heat of the hand to the vessel. The specifications pointed out that were it not for the expansion chamber in the nozzle the liquid would issue in a continuous stream and that the reduction of pressure obtained when the liquid enters the expansion chamber results in partial vaporization, causing the liquid to leave the point of discharge in a mixed condition, that is, partly in a liquid and partly in a vaporous state. In other words, the expansion chamber acts to create a spray, thus permitting fine and even distribution over the surface of the part being treated.

The second Gebauer patent, No. 711,045, was an improvement upon the first, by way of eliminating the capillary opening from the valve passages to the nozzle, and accomplishing the result of permitting discharge either in the form of a spray or of a continuous stream. This was to be done, the specifications disclose, by regulating

the valve opening so that, if a stream were desired, the valve opening would be larger than the discharge opening of the nozzle, thus maintaining the pressure previously generated, or, if it were a spray that was wanted, the valve opening would be smaller, thus permitting a reduction of pressure in the expansion chamber, as above noted.

The first Rotheim patent disclosed both an apparatus and a method for "atomizing materials of semi-liquid consistency by means of a gaseous pressure medium which forces the material through a suitable discharging nozzle." The pressure medium is set forth to be a gas "condensible at comparatively low pressures," examples of which are dimethylether, methyl chlorid, and isobutan, which are hydrocarbon compounds, and are insoluble, or only slightly soluble, in water. Examples of the "materials of liquid or semiliquid consistency" to be sprayed are set forth as paint, insecticides and perfume. Claim 1 is typical of the method claims and in effect comprises the following elements: the forming of what might best be called a charge of the material to be sprayed and the gas pressure medium, these being kept at a pressure not less than the liquefaction pressure of the gas under the prevailing conditions, so that the charge is entirely liquid in form; the causing of a confined stream of liquid to flow from the main body of it towards a point of discharge into the atmosphere; the subjecting of the confined stream to a substantial and sudden release of pressure before it reaches the discharge point, this release reducing the pressure below the point of liquefaction of the gas, thus dispersing the material to be sprayed in "a flowing compressed gas"; and the discharging of the material as thus dispersed into the atmosphere through a restricted opening.

Claim 4, which is typical of the apparatus claims, covers an hermetically sealed can filled with a charge of the material to be sprayed and the hydrocarbon compound under sufficient pressure to keep it in a liquid state, in combination with an "ejection member" having an "internal channel"; a connection between the channel and the charge in the can; the channel being wid-

ened, that is, having an expansion chamber, immediately in the rear of the discharge opening of the "ejection member"; and the centers of the channel, of the expansion chamber and of the discharge opening being substantially parallel.

The second Rotheim patent relates to "coating compositions of the type containing nonvolatile solid or liquid substances adapted to form a lasting layer on surfaces of objects of various kinds," the compositions having those characteristics which enable them to be "readily converted into a spray." The composition, the specifications state, consists of a "substantial proportion of a gaseous nonoxygenous hydrocarbon compound in a liquefied condition," that is, under sufficient pressure; and a "common coating composition" such as paint, lacquer, varnish, or lubricants, whether of the water soluble type or of the type having oil, alcohol, or other liquid as a vehicle. To this extent, then, the patent claims the composition which is disclosed also, in combination with other elements, in the first Rotheim patent as well as in the Helbing and Pertsch patents. Claim 2 adds to this combination, however, an additional element, "a liquid vehicle comprising a hydrocarbon compound liquid at ordinary temperature," such as alcohol, the purpose of which is, as the specifications state, to act as a "vehicle" for coating compositions that are not soluble in water.

It is the addition of this last element to the combination on which appellant relies to show lack of anticipation by Helbing and Pertsch. The affidavit of its expert asserts, as a result of tests made, that this is important in that without it the surface of the coating may be rough because of too rapid or too little evaporation of the liquefied gas before the coating material reaches the surface to be coated, depending upon whether the nozzle is held far from or close to it. Even assuming this to be true, however, it may well be that there was anticipation by Helbing. For Helbing's specifications refer in two places to the addition of alcohol or ether, which; we may notice judicially, are liquids at ordinary temperatures, "to facilitate solu-

tion" or "to increase solubility * * * as will be well understood by chemists." Appellant insists that Helbing does not suggest that either alcohol or ether be used in such quantities as to permit them to be called "vehicles" for the solid. But this may be only a quarrel with words; a "solvent" or compound facilitating solution and a "vehicle" may well be but different names for the same thing. Rotheim himself apparently thought so, for he used the terms interchangeably, speaking of a coating composition whether "of the water soluble type or of the type having oils, alcohol or other liquid as a vehicle," or, again, of "nonaqueous vehicles such as petroleum distillates and other liquid organic solvents."

Were we skilled in the art it might be simple to determine whether there was any "genuine issue" as to any material fact with respect to the anticipation of the second Rotheim patent, but we lack that special knowledge which would permit us to read the patents so understandingly and this record is barren of proof to enable us to do so.

The situation as to the first Rotheim patent is substantially the same. Helbing and Pertsch cannot be said to have anticipated it. All that they disclosed was the mixture of a coating substance and a volatile liquid. The method of application, suggested by the specifications, was simply to place the solution in a glass or metal, hermetically sealed vessel, on which the heat of the hand could operate so as to cause the volatile liquid to begin to evaporate, in turn causing internal pressure and, consequently, ejection of the liquid in a jet or spray. The concept of retaining the composition under such pressure as will keep the gaseous pressure medium in liquid form and then subjecting the composition to a sudden reduction in pressure by way of an expansion chamber in the nozzle, thus producing atomization, was not disclosed by them.

Gebauer's two patents, however, at least on their face, disclose a very similar concept and a very similar means of achieving it. Both Gebauer and Rotheim show the use of a volatile liquid that is partially vaporized by a reduction in pressure as a result of the nozzle's expansion chamber. But Gebauer's patent related to the application only of a volatile liquid, and nowhere suggests the use of that liquid as a means of application of a coating material such as paint, wax, insecticides, oil or the like. It would seem, moreover, that his object was not to obtain to the greatest possible extent the evaporation of the volatile liquid, but to cover the surface being sprayed with a fine film of the liquid. Thus, according to appellant's expert, the Rotheim apparatus, to accomplish the purpose intended, i. e., spraying the coating material in a fine, even spray, must deliver between one million and ten million drops per milliliter of liquid, while the Gebauer device, if operated to deliver in excess of about one hundred drops per milliliter would be ineffective, resulting in little more than merely blowing gas against the surface being sprayed. The Rotheim claims, however, are not quite so narrow; he does not tie them to any number of droplets his apparatus or method should produce nor indeed to the generality that all or substantially all of the liquefied gas should be evaporated, though he does indicate that the more complete evaporation that is achieved, the better the coating that will be obtained, and speaks of the coating material's being dispersed in a "flowing compressed gas."

██ This aside, we nevertheless think that appellant is entitled to a trial as to the validity of both Rotheim patents. For whether the use of Gebauer's volatile liquid as a means of spraying a non-volatile substance required invention cannot be decided on the basis of the sketchy record before us. Almost twenty-eight years elapsed between the time of Gebauer's application for No. 668,815 and Rotheim's for No. 1,892,750. There is in this record no indication that during that time Gebauer's contributions were significant in the development, or in the commercial practice, of the atomizing art and without the aid of evidence now lacking we cannot

320

put them in their proper setting and say with the requisite assurance that there is no genuine issue as to the fact of anticipation which the appellee asserts.

Judgment reversed and cause remanded.