INGLETT & COMPANY, Inc., Appellant,

v.

EVERGLADES FERTILIZER COMPANY, Inc., Appellee.

No. 16555.

United States Court of Appeals Fifth Circuit.

May 7, 1958.

Richard Spencer, Stamford, Conn., Charles O. Andrews, Jr., Orlando, Fla., Blair & Spencer, Stamford, Conn., of counsel, for appellant.

Philip Dressler, Ft. Lauderdale, Fla., Percy Freeman, New York City, Samuel J. Stoll, Jamaica, N. Y., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole question here is whether the District Court could properly enter summary judgment for the defendant and against the Patentee presumably on the ground that there was no genuine dispute on the facts showing anticipation by the prior art. We emphasize this at the outset because, while here and there, the opinion may take the turn of one disposing of an appeal on the merits of a patent infringement suit, our inquiry and our analysis is directed to the much narrower question whether this was a case for summary judgment.

## I.

The Inglett patent [1] is for an improved method of weighing and bagging bulk materials by which weighed quantities sufficient to completely fill the kraft bag are discharged from the hopper device through a large spout directly into the open mouth of the bag held lightly in place by the operator so that from the impact of the material, the bag drops quickly to a conveyor belt below, and is almost simultaneously carried away, to allow the operator successively to repeat the process.[2] As the Patentee analyzed the nine

[1]. 2,705,607 issued April 5, 1955, to Wilfred L. Inglett. The date of filing June 12, 1953, has a critical importance.

[2]. It is described more fully in the Patentee's brief:

"The Inglett patent in suit is directed to an improved method of weighing and

claims, the principal steps [3] included fast moving slugs of the material falling by gravity at predetermined regular intervals into a bag held with a force insufficient to withstand the impact of a slug thus allowing the bag to fall away and drop onto a movable supporting surface.

## II.

At an early and extensive pretrial conference, it was recognized by the Patentee's counsel that if defendant could satisfactorily establish that the bag-filling method used by Arcady Farms Milling Company in its Illinois plant (specified in the defendant's Notice of Prior Art) was in bona fide use more than a year prior to the filing of the application (June 12, 1953) and was the substantial equivalent of the disclosure of the patent, the plaintiff would lose and the defendant would win on the plea of invalidity. If that

were established, counsel was both candid and wise enough to say, a trial running the gamut of the traditional patent suit contentions and defenses would be a waste of time. But whether read in or out of context, the colloquy did not amount to an agreement that, after the proposed depositions and inspection at the Arcady Mills plant, the Court could summarily dispose of the case on that point even though there were issues of fact concerning it. And yet that is substantially what occurred.

After the first Geberin deposition was taken on October 1, 1956, at Arcady Mills plant, defendant moved for summary judgment. The moving papers were composed of the motion and the extensive supporting affidavit of Samuel J. Stoll, Esq., its able and energetic counsel below and here. This remarkable document

bagging bulk materials such as fertilizer, dry chemicals, flour, feed and the like. As disclosed in the patent and in the plaintiff's brochure bulk material is fed from a storage bin by means of a horizontal belt conveyer which leads to a discharge point located above a weigh hopper. The material falls by gravity from the end of the conveyer belt into the weigh hopper until a predetermined weight of material has been deposited in the hopper whereupon the flow of material to the hopper is interrupted. A gate mechanism, which controls an opening in the bottom of the weigh hopper then opens automatically to permit the weighed material in the hopper to fall by gravity through the opening into a bag held on a vertical spout positioned beneath the opening.

"The bag is held on the spout with a force which is insufficient to withstand the initial impact of the material falling from the hopper into the bag, wherefore the material, in striking the bottom of the bag, causes the latter to fall away from the spout and to drop, partially filled, onto a moving conveyor. In striking the conveyor, the material in the bag spreads out causing the bottom of the bag to flatten out and seat itself firmly in an upright position on the moving conveyor while the remainder of the weighed material is fed into the bag so quickly that the bag is accurately and completely filled before the moving conveyor can carry it away from beneath the spout."

3. The Patentee delineates the steps as follows:

(a) Supplying a succession of measured, e. g., weighed quantities, of bulk material in the form of fast moving slugs falling by gravity, at substantially regular intervals from a vertical spout disposed above a movable horizontal supporting surface;

(b) In the interval between two successive supplying operations, applying an open-mouth bag to the spout in position to receive the next slug of material falling from the spout;

(c) Holding the bag in position on the spout with a force which is insufficient to withstand the impact of a slug of material striking the bag;

(d) Allowing the bag to fall away from the spout and drop to the supporting surface located a predetermined distance below the spout in response to the impact of the slug striking the bag, and

(e) Removing the filled bags as they drop to the movable supporting surface to clear the space for the next bag filling operation.

With but slight renumbering, this is the description given by Judge Hoffman in Inglett & Corley, Inc., v. Baugh & Sons Co., D.C.E.D.Va., 159 F.Supp. 583, in which, after full trial on the merits and an earlier refusal to grant a similar motion for summary judgment, the Court held the Inglett patent invalid for anticipation by the prior art.

covers pages 31 to 54 of the printed record and then incorporates by reference 36 pages of extracts from the patent file wrapper, the Geberin-Mitchell deposition in this case and the deposition of Inglett taken by the defendant for use in the pending Virginia case, note 3, supra. After counteraffidavits of Inglett and his associates and several bagging people describing the comparative utility of the former and Inglett methods, Stoll filed a reply affidavit which, like the opening one, was extensive, covering with attachments another 21 pages of the printed record. The motion was fully argued with extended colloquy between Court and counsel discussing, as to both basic and subsidiary points, the existence and genuineness of factual controversies.

As we hold that these were issues requiring the Judge to hear and determine them as a trier of fact, as the Judge had done in the Eastern District of Virginia, little good would be served in discussing this evidence in detail. On the contrary, harm might be done, for despite our earlier caveat, Court or counsel or both might read into words said or unsaid and emphasis from inclusion or exclusion some indication by us of our views on the ultimate merits or decisive points. It sufficiently serves our purposes to confine our comments to illustrative references.

## III.

In assaying this it is well to point out that anticipation, like infringement, involves questions of equivalence and is an inquiry requiring a factual determination.[4]

At the outset, the Geberin deposition, whether considered separately, F.R.C.P. 56(e), 28 U.S.C.A., or as an attachment substantiating what Stoll the witness, not Stoll the lawyer, knew, was an unusual thing. In defendant's Notice of Prior Art, reference was made to a machine shown in the 1954 issue of The Modern Packaging Encyclopedia. This showed the Arcady Mills so-called 5-6 machine in which apparently an operator held a bag on the discharge spout. The two questions were (1) was this substantially the same as the patented disclosure and (2) if so, when, in point of time, had this operation begun? This Geberin disposition is a conglomeration[5] of counsel's discussion, statements on the record, omissions off the record, informal-like questioning now of Geberin, elsewhere of Mitchell, a vice president of Arcady Mills who served in many roles as observer, occasional witness as he made statements, and friend, associate and adviser to Gerberin, his subordinate.

On the first question (1) substantial equivalence of the patent disclosure, the deposition is primarily counsel's statement. Apparently the whole retinue made an inspection of the machine in operation. At the opening of the deposition, Mr. Stoll made an extensive statement describing the operation. To this counsel for Patentee responded by terms which showed a pretty large agreement in many things. But on the crucial point which has preoccupied Court and counsel

4. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, 673; Thompson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 44 S.Ct. 533, 68 L.Ed. 1098; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F. 2d 365, 370; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 206 F.2d 772, 778; Fritz W. Glitsch & Sons, Inc., v. Wyatt Metal & Boiler Works, 5 Cir., 224 F.2d 331, 334; Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111, 118; Leishman v. General Motors Corp., 9 Cir., 191 F. 2d 522, 523, 529; Faulkner v. Gibbs, 9 Cir., 170 F.2d 34, affirmed per curiam 338 U.S. 267, 70 S.Ct. 25, 94 L.Ed. 62.

5. We mean no disparagement of any of these participants, all of whom seemed genuinely anxious to find out and record all of the pertinent information, much of it early, if not ancient, history, without unduly imposing on this stranger to the controversy (Arcady Mills). These circumstances are, however, pertinent in determining whether this deposition and Stoll's "facts" derived from it were so crystal clear that the Judge, as a judger of law, and not a trier of fact, could say that all was undisputed.

here, below and in Virginia, the manner and extent to which the operator must hold onto the bag and the essential ingredients of a method which permits one, rather than the other, there was not acceptance or acquiescence. Had it been, or had it been so intended, this experienced patent counsel who had earlier expressed his awareness of the decisive issues with great candor, would hardly have continued either his presence there or the extensive work in the analysis of the Stoll affidavit and preparation of counter-affidavits and papers in opposition to the motion for summary judgment.

■ The second question (2), the time Arcady operations began, was equally uncertain especially when tested as it must be in the light of the principle that where an unpatented device, the existence and use of which are proved only by oral testimony, is asserted as an anticipation of the patent, the proof sustaining it must be clear, satisfactory and, by some it is said beyond a reasonable doubt, Hoeltke v. C. M. Kemp Manufacturing Co., 4 Cir., 80 F.2d 912; Zachos v. Sherwin-Williams Co., 5 Cir., 177 F.2d 762, 763; Walker on Patents, Deller's Ed., § 63, pp. 300–309. Geberin or Mitchell, or both, said that it must have been "about 1950." But with the date so crucial, whether this was a positive affirmation that it was prior to June 12, 1952, was a conclusion only one who *weighed* the contents of this deposition could reach. The date seemed to be fixed in relation to other things, e. g., the addition or change of a certain type of spout, etc., as to which it was stated shop records never inspected or produced if still existent,

would be decisive. There was also much confusion and uncertainty as to what machines were being discussed, just what the changes in operations respecting, for example, use of clamps on the bags, etc., had been. We do not say that a trier could not find that the date was pre-1952. What we say is that that conclusion, on this deposition, would be the product of weighing, assimilating, sifting and inferring. The two functions of the Court, though, at one stage or another as a law suit wends its way through the courthouse, committed to the person of the same Judge are quite distinct. Cf. Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498; Whiteman v. Pitrie, 5 Cir., 220 F.2d 914.

IV.

■ By the very nature of the case, the Stoll affidavit, whether read as an original statement of facts known to the affiant or a mere convenient persuasive collection of those derived from the Geberin or Inglett depositions, reflects on its face that most of the important matters there discussed presented genuine factual controversy. The affidavit scarcely gets underway before he refers to file wrapper [6] estoppel to show that the Examiner, had he *known* of Arcady, undoubtedly would have declined to issue the patent, or would have considered the sole point of novelty to be the manner in which the bag was held. While we may assume that the Court in reaching conclusions on the basis of this written document might be making findings having less insulation under the clearly erroneous principle, F.R.C.P. 52, 28 U.S.C.A., cf. Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217; Thomas v. Commissioner of Internal

6. It was apparently so treated by Judge Hoffman who, in note 1 of his opinion, quoted it as it appears in our record [159 F.Supp. 585]:
"This amendment is presented after conferences with the Principal and Assistant Examiners in charge, and with a view to placing the case in condition for early allowance on the basis of method claims 54–61 * * * submitted herewith. As to said claims, it is applicant's understanding that they will be favorably considered and the application promptly passed to issue if the Examiner's further search fails to develop prior art against one significant step of the claimed method, namely, that of holding the bags to the spout with a force insufficient to withstand the impact of the slugs (measured quantities) of material striking same, whereby the bags fall away from the spout and drop to a supporting surface responsively to the slugs depositing therein."

Revenue, 5 Cir., 254 F.2d 233, estoppel as an equitable matter nearly always springs from facts. What did the Examiner [7] mean? This might be what did he mean with respect to matters of fact? What did he mean with respect to matters of law? Indeed, whether file wrapper estoppel arises may depend on the factual setting, cf. Hunt Tool Co. v. Lawrence, 5 Cir., 242 F.2d 347; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365.

Likewise, there was considerable disagreement about the operation of the Arcady 5–6 machine in contrast to the patented one. With full awareness that consideration of evidence on commercial utility must generally be carefully restricted, the counter-affidavits at least disclosed the probable existence of substantial differences in the practical operation of the two machines. Whether the evidence of commercial utility would or would not finally be cogent [8] on the question of validity, the practical advantages of the new over the old were, at that stage of the proceedings, a strong indication that there is, or may be, some practical difference. What that practical difference is remains a question of fact. After the factual determination is made, the Judge then determines its legal significance.

Here the moving papers revealed that whereas Arcady 5–6 had a maximum capacity of eight 50-pound bags per minute, the patented machine could handle as many as twenty bags of 100-pounds per minute. In a plant of 30,000 tons annual production, the savings in labor costs alone were calculated to amount to over $10,000. Indeed, the papers show that in the inspection at Arcady Mills, an effort was made to operate the Arcady 5–6 machine in the way the patented method works, essentially by holding the bag lightly and having it jerked out of the operator's hands as it simultaneously fills and drops to the conveyor. It was acknowledged by all that these efforts were unsuccessful. Unless the operator continued to hold the bag to the spout of Arcady 5–6 as it filled, the material spilled all over and the predetermined weight was not packaged. Of course, Stoll, the witness, or Stoll, the lawyer had an explanation [9] which sounds persuasive but whether it was a good or bad explanation, whether it destroyed any practical worth of the experiment were questions about the way a bagging hopper works. Judges have no prescience in this field. What they know, they must be told and what they are told as facts must be weighed as such.

Involved in this comparative analysis of operations were such things as the technical meaning of descriptive terms used in the claims. For example, was the material coming out of the spout in Arcady 5–6 moving as a mere "stream" or was it a succession of "fast moving slugs"? When it is borne in mind that in the weird patenteese of the solicitor's jargon, Courts have all acknowledged that the "patentee may be his own lexicographer and * * * his own grammarian," Chicago Steel Foundry Company v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812, 814, there is a threshold fact question about what was the meaning of such technical terms. The

7. Stoll's affidavit not only purports to make the facts uncontroverted, it supplies some which are missing and which may be of considerable importance. For example, with respect to this file wrapper estoppel, note 6, supra, he stated: "The Examiners undoubtedly conducted the further search mentioned on page 88 of the file wrapper and evidently were unable to develop the prior art sought,"

8. For full discussion, see Walker on Patents, Deller's Ed., § 44, pp. 234–241; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Ritchie v. Lewis-Browning Mfg. Co., 5 Cir., 196 F.2d 434; American Monorail Co. v. Parks-Cramer Co., 4 Cir., 245 F.2d 739; S. H. Kress & Co. v. Aghnides, 4 Cir., 246 F.2d 718.

9. Stoll points out that this was primarily a question of the speed at which the Arcady 5–6 machine was set to trigger the hopper gate.

Judge [10] might ultimately conclude that a "slug" is a "slug" and that there is no essential difference between a slow-moving stream and a fast-moving slug but when he does so, he has made no deliverance on the law—he has fulfilled the ancient and essential function of fact-finding. Our predicament and that of the Judge below is not a new one for, "Were we skilled in the art it might be simple to determine whether there was any 'genuine issue' as to any material fact with respect to * * * anticipation * * * but we lack that special knowledge which would permit us to read the patents so understandingly * * *," Bridgeport Brass Co. v. Bostwick Laboratories, 2 Cir., 181 F.2d 315, 319.

■ As a matter of fact, it is at this point, we think, that the utter misconception of the function of summary judgment is most strikingly revealed. For almost as a concession that the technical meaning of these patent terms was a matter to be proved as a fact for determination by the Judge as a fact is the retort in the defendant's brief: "Why such expert testimony could not be put into the form of an affidavit in opposition to the motion for summary judgment remains a mystery." But we have often said that summary judgment is no wager of affidavit, no compurgation by the most swearers or the most papers. Where by the nature of things, the moving papers themselves demonstrate that there is inherent in the problem a factual controversy then, while it is certainly the part of prudence for the advocate to file one, a categorical counter-affidavit is not essential. Bruce Construction Corp. v. United States, 5 Cir., 242 F.2d 873; Whitaker v. Coleman, 5 Cir., 115 F.2d 305.

How thoroughly the function of affidavits purporting to state facts in support of motions for summary judgment was confused with the laudable function of the advocate and the hope that counsel's observations could take the place of testimony normally offered is further evident. Stoll's affidavit undertakes to compare, claim by claim, step by step, each of the two operations. From this he then concludes as a fact that for which expert witnesses are normally used. Analyzing it step by step substantially as it is summarized in note 3, supra, he asserts that

---

10. The Court had great difficulty on this as the colloquy on the motion for summary judgment reveals:

"The Court: * * * I don't think we ought to get off into the slug business * * * this is his argument, now— that you [Patentee's counsel] * * * or your side, has sort of changed from side to side between 'streams' and 'balls' or use of 'slugs.' 'Slugs' to me would sound like something more than a stream. I don't know what it is. You will have to explain that to me. * * * But actually he contends that the 'deposit', to use a neutral term, is somewhat the same thing. * * *

"The Court: Well, he [Stoll affidavit] read from witnesses * * * apparently your own plaintiff that described—he put him to the task of defining what the 'slug' was, and the * * * plaintiff, gave a description of 'slug' which doesn't sound like a 'ball.' * * *

"The Court: I don't think we need experts for that sort of thing. Do you seriously think we do?

"[Patentee's Counsel]: To explain the patent and meaning of the claims, including the term 'slug'; yes, your Honor.

"The Court: To explain what a 'slug' is?

"[Patentee's Counsel]: Yes, your Honor.

"The Court: In the language in which you people have been considering it in the case?"

Almost out of understandable exasperation, the Court said:

"Wait a minute. Is this question here unclear as to the deposit? I don't want to use the word 'ball' and I don't want to use the word 'slug', I don't want to use the word 'stream'; but the charge, the load, the deposit—is there any real confusion here as to how that transpires?"

To show that Patentee's predecessor counsel had used "slug" in a contrary way, Stoll's reply affidavit sets forth correspondence from that counsel. If, as implied, Patentee had used it in two senses, and its true meaning was essential in the comparative analysis of the two machines, which of the two was the true meaning was a fact decision.

the patent claims "read on" each of these ingredients. We may assume that an expert patent counsel or engineer might be permitted in proper circumstances to give such evidence, but in an appliance so remote from the common experience of Judges, it will be an unusual case in which this "fact" is compulsorily established as a matter of law.

## V.

We think that the administration of justice generally makes it appropriate for us to comment briefly on what we believe is an inherently unsound practice revealed by this proceeding. In it we assume that while the instances in which summary judgment will be available is limited[11] in patent litigation because of its inevitable fact controversies relating to invention, utility, novelty and infringement, it may nevertheless be used in a proper case.[12] But without impugning any improper professional motive to this obviously able counsel, we doubt that the disposition of patent cases is furthered by counsel being the personal vehicle by which the "undisputed" facts are put before the Court. We consider it a tribute to the high calling of advocacy to say that we think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater. Certainly we would not reverse a Judge for entering summary judgment merely because some of the papers included argumentative conclusions. But if the "facts" are really facts, they should be put forward as such without interstitial argumentation.[13]

And if it takes an oath to establish or affirm that which is a fact so that it can be further established as an "uncontradicted" fact, we doubt that it is con-

11. Its limitations were graphically pointed out in Gray Tool Company v. Humble Oil & Refining Co., 5 Cir., 186 F.2d 365, and see Long v. Arkansas Foundry Co., 8 Cir., 247 F.2d 366, 369: "There are a number of reasons why we think the summary judgment procedure provided by Rule 56 * * * is not ordinarily appropriate for the disposition of a patent case." Hycon Mfg. Co. v. H. Koch & Sons, 9 Cir., 219 F.2d 353.

12. See George P. Converse & Co. v. Polaroid Corporation, 1 Cir., 242 F.2d 116; Vermont Structural Slate Co. v. Tatko Bros. Slate Co., 2 Cir., 233 F.2d 9, certiorari denied 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123; Bobertz v. General Motors Corp., 6 Cir., 228 F.2d 94; Magee v. Cola-Cola Co., 7 Cir., 232 F.2d 596; Syracuse v. Paris, 9 Cir., 234 F.2d 65.

13. That Mr. Stoll inevitably succumbed to the nature of his calling is apparent from these extracts from his supporting affidavits:
"This, then, is the patented invention: it is not the bag-filling machine, it is not the weighing process, it is not the discharging process. It is merely the single step of holding the bag loosely to the bag spout so that the weight of the material deposited therein will cause the bag to drop to a supporting surface.
  *     *     *     *     *
"Two observations are pertinent here. The first is that the high productive rate of plaintiff's machine is not necessarily an achievement or goal for which men have long striven. There are limits beyond which workers should not be driven and while I do not pretend to know whether plaintiff has passed these limits, it is of interest to note the following colloquy between Court and counsel at the pre-trial conference on September 17, 1956: * * *
  *     *     *     *     *     *
"With the foregoing as a description of the Arcady operation as I witnessesd it, it may be stated without fear of contradiction that the claims of the patent in suit—without exception—read verbatim and in spirit upon the Arcady bag-filling method.
  *     *     *     *     *
"This attempt [referring to Patentee's counter-affidavits concerning fast-moving slugs] to distinguish the patent in suit from the prior art is most interesting and it is completely revealing of the utter bankruptcy of plaintiff's case. From the inception of this action to virtually the present day, we have been trying to persuade [Patentee's former counsel] that defendant does not infringe the patent in suit because defendant's machine discharges the material in the form of a stream whereas the patent requires that it be discharged in the form of a slug. But [Patentee's counsel] refused to be persuaded and he assumed the unyielding position that a stream is a slug and that consequently the patent was infringed.

ducive to the orderly administration of justice for counsel to become the voice on summary judgment. The reason behind the accepted canon on counsel testifying is or may be present, at least tentatively since the Court is put in the position of passing upon the credibility of the contending votaries. Experience proves that the adversary system functions best when the role of Judge, of counsel, of witness is sharply separated.

We end as we began: this was not a case for summary judgment. The issues are to be tried in the traditional way. What the decision will, or ought to, be is for the Court which tries the case. What we have said or left unsaid is of no moment on that trial.

Reversed and remanded.