**SOUTHERN IMPLEMENT MFG. CO.,**
**Inc. and George Partin, Appellants,**

v.

**Price C. McLEMORE, Appellee.**

**No. 21458.**

United States Court of Appeals
Fifth Circuit.

Aug. 16, 1965.

J. J. Breland, Sumner, Miss., Theodore R. Scott, Chicago, Ill., Breland & Whitten, Sumner, Miss., James P. Ryther, Chicago, Ill., for appellants.

Hugh P. Carter, Birmingham, Ala., Jack F. Dunbar, Clarksdale, Miss., Jennings, Carter & Thompson, Birmingham, Ala., Talbot, Sullivan & Dunbar, Clarksdale, Miss., of counsel, for appellee.

Before JONES and BROWN, Circuit Judges, and SHEEHY, District Judge.

## JOHN R. BROWN, Circuit Judge:

Appealing from a decree sustaining the validity and infringement of patents 328 [1] and 353,[2] the Infringers [3] make two principal attacks. The first charges double patenting, the second prior public use or sale. We reject both and affirm.

The art involved is that of cultivation of growing plants, notably cotton, and other row crops by means of an intense flame. Willingly running the risk that our words will lack the precision of a patent claim and an effort to simplify into understandable terms will likely produce inaccuracies, we would describe this matter in these general terms. Up to this moment at least, the Patentee is officially credited with having first made the basic discovery of such a method followed subsequently by a series of discoveries as to apparatus. Destroying weeds by flame was nothing new. And considerable experimentation had gone on for the use of flames in destroying weeds in the cultivation of growing crops. The technique, however, was essentially to consume the weed by intense direct fire. Flame, in such a practice, had to be kept wholly away from the growing plants. This was done in various ways including, for example, as in one of the cited references,[4] by metal shields extending from the ground up the plant stalk. Protecting the plant and destroying weeds between the rows, this method had no effect on the weeds growing in the crop row itself. As at least one inventor who had the now superfluous "flash of genius" [5] from seeing a rotogravure picture of an Italian military tank with flame thrower about 1938, the Patentee's new concept was to subject both weed and growing plant alike to flame. This approach takes into account differences in size and structure of these growing things with the weeds dying from being seared, while the growing plant suffers only temporary damage. To accomplish this, it is necessary that the flame be intense, high temperature, flat and thin. And it must be directed downward only slightly from the horizontal from one side of the crop row through the crop row itself. If the flame is directed too high, it destroys the plant as it does the weed. If the angle of declination is too severe, the flame, striking the ground at or near the base

1. McLemore No. 2,408,328, issued September 24, 1946, application November 4, 1940, but entitled to filing date of October 11, 1939, as result of a division of No. 2,327,204. Claims infringed: 1, 3, 4, 6, 7, 8, 9, and 11.

2. McLemore No. 2,487,353, application filed April 30, 1945, issued November 8, 1949. Claims infringed: 11, 13, 14, 16, and 17.

3. Southern Implement Manufacturing Company, Inc. and George Partin.

4. Item No. 899,404 issued September 22, 1908.

5. Great Atlantic & Pac. Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, cert. denied, 1950, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799; 35 U.S.C.A. § 103.

of the stalk, causes the intense heat to be deflected upward with like destruction of the plant.

This method concept was the subject of No. 2,327,204 (see notes 1 and 6) issued August 17, 1943, after division. But there was a substantial problem in translating this method into practice. The problem was one of devising a suitable arrangement to permit burners capable of generating this directionally controlled flame to move continuously down the furrow on each side of the crop row at a proper height above the ground and distance from the plants. There were at least two complicating factors. One was the unavoidable changes in the elevation and conformation of the floor of the furrow. This meant that if elevation of the burner depended on the relative position of the main supporting wheels (such as that of the tractor), there was considerable risk of serious damage to the growing crop as the burner tip rose or fell above or below the required level. The second was the need for being able to raise the burners sufficiently to permit movement of the machine to and from the field and, more so, in making turnarounds at the row ends.

To solve—and successively better solve—these application problems was the object of the Patentee's several patents which are the core of this litigation.

The first is 328, filed in 1940 following the division. However, before it was granted in 1946, two additional patents, filed in 1942 and 1943 respectively, were issued in 1945, and 353 was filed in 1945 though not granted until 1949.[6] Since the Infringers' activities did not commence until after expiration in 1962 of RE 22803 and RE 22836, their validity is not immediately involved. But they are brought under close scrutiny since the Infringers urge that RE 836, if not also RE 803, is indistinguishable from 328 and 353 making either one or both of the latter void for double patenting.

To those not privy to the esoteric mysteries of this calling, there might be some wonderment why a system which moves no faster than the patent-issuing process allows the inescapable difficulties of patent law to be magnified by processing separate but nonetheless related applications at separate times and in separate ways as though none of the others existed.[7] A likely explanation here as to 328 is that the Examiner—perhaps taking his cue from "the ant-like persistence of [patent] solicitors" made famous by Judge Learned Hand's observation [8]—twice rejected critical proposed claims, was twice reviewed by the Board of Appeals and twice reversed. In any event during the six-year period of gestation for 328, the forerunners of

6. This is a chronological rundown:

| Number | Date Application Filed | Date Entitled To Be Filed | Issued | Expires |
|---|---|---|---|---|
| 2,327,204 | 10/11/39 | | 8/17/43 | 8/17/60 |
| 2,408,328 | 11/ 4/40 | 10/11/39 | 9/24/46 | 9/24/63 |
| 2,369,154 | 5/ 8/42 | | 2/13/45 | |
| RE 22803 | 2/11/46 | | 10/15/46 | 2/13/62 |
| 2,391,027 | 1/ 9/43 | | 12/18/45 | |
| RE 22836 | 5/15/46 | | 1/28/47 | 12/18/62 |
| 2,487,353 | 4/30/45 | | 11/ 8/49 | |

7. It could hardly be laid to the fact that the right hand knoweth not what the left hand doeth. In 328 explicit reference was made to 2,327,204 (and the division), and each of the other applications made express reference to all of the other copending and previously issued applications. And before 328 issued in 1946, the file wrapper contained nearly all of the material, photographs, field studies, service manuals, etc. on the devices up to and including that of 353.

8. Lyon v. Boh, S.D.N.Y., 1924, 1 F.2d 48, 50.

RE 803 and RE 836 involving apparatus no less complicated came out in three and two years respectively.

Again, in a very rough way, we summarize the various disclosures broadly. In 328 the apparatus is essentially a part of a vehicle such as a tractor with the burners, in one proposed embodiment, being suspended vertically from each side of the tractor and in another from a transverse bar across the front of the tractor. However, these burners are wholly suspended from the vehicle having no contact with the ground (except accidentally). A substantial disadvantage is that this pretty well immobilizes the tractor for any other use. In RE 803 the fittings on the tractor become perhaps less permanently attached. The burners are affixed to vertical members suspended from a transverse bar at the front end of the tractor. Each has a small bracketed wheel and a plunger-type spring device so that the burner would rise and fall with changes in elevation of the furrow. In another embodiment, the vertical member is pivoted freely to the transverse bar. A lever arrangement permits the burners to be raised to an inoperative position. In RE 836 the design is essentially one for a flame cultivator to be attached temporarily for time of use to a standard tractor. It consists essentially of side pieces which are fastened to the tractor rear axle housing to form the bottom part. And top members inclined upward and held firmly in position by diagonal braces to which there is affixed the lever device for lifting the burners to an inoperative position. For the first time, the burners are mounted to vertical standards affixed to metal skids, the forward top ends of which are pivoted to pieces fastened to a transverse member in the rear of the tractor. Raising the burners to the inoperative position was accomplished by depressing a lever at the top of the frame (preferably by hydraulic power) which, by cables, lifted the trailing edge of the skids. This aim of a readily removable cultivator was a principal object in 353. It consists of an attachment frame with two sidearm portions to be fastened to the tractor frame and axle housing. To the rear of the tractor there is a horizontal draw shaft, sometimes called a rocker shaft, on which vertical draft arms are pivoted. The draft arms lead diagonally down to a pivoted connection with a metal skid. On each skid is a verticle standard to which a burner is mounted at adjustable heights. Each of the skids, pivoted on the draw shaft, rises and lowers freely as elevation of the furrow changes. The skid-burners are raised to inoperative position by rotating the transverse draw (rocker) shaft. There are lugs welded to this rocker shaft to which a transverse member is fixed. As the rocker shaft is rotated the transverse member strikes the bottom leading edge of. the draft arms raising all of them in a vertical direction.

Whatever its patent significance, it is evident that 353 is the culmination of a series of practical improvements producing an apparatus which efficiently meets the problems through burners independently suspended, readily capable of adaptation to changes in the ground level, with sufficient leeway to permit side-wise movement to adapt to the contour of the furrow and a simple, effective means of raising the burners to an inoperative position.

The parties seem to differ slightly, if at all, on controlling legal principles. Double patenting is forbidden. But a single patent may be obtained for a single invention. Although co-pending applications of a single inventor (see note 6, supra) are not prior art as to each other, it is essential that each of the claims be patentably distinguishable. None may be identical. Stating it conversely, comparing claim by claim as between the several co-pending applications, patentable differences must exist. And, of course, in that process, it is proper to consider what is disclosed by the prior art. Application of Russell, 1956, 239 F.2d 387, 388, 44 C.C.P.A. 716; Application of Ockert, 1957, 245 F.2d 467, 469, 44 C.C.P.A. 1024; S. H.

Kress & Co. v. Aghnides, 4 Cir., 1957, 246 F.2d 718, 726; Weatherhead Co. v. Drillmaster Supply Co., 7 Cir., 1955, 227 F.2d 98; Plax Corp. v. Precision Extruders, 3 Cir., 1957, 239 F.2d 792, 796; 1 Deller's Walker on Patents § 62 (2d ed., 1964); 2 Walker on Patents § 280, p. 1279 et seq. (Deller's ed. 1937).[9] As a possible point of divergence, the Patentee urges the apparently accepted principle which recognizes validity, indeed extension in point of time, of the dominant patent first applied for even though it is belatedly issued after issuance of improvement patents.[10] And great stress, at least by way of analogy, is put on our decision in Pierce v. Aeronautical Communications Equipment, Inc., 5 Cir., 1962, 307 F.2d 790, 134 USPQ 533.

Comparing the claims of 328 and 353, respectively, as later issued patents against those of RE 836,[11] the District Judge was authorized to find as a fact, conclude in law (or both), that there were patentable distinctions.

■ In doing so, we agree that the District Judge was in error in stating that since 328 "is entitled to a filing date ahead of" RE 803 and RE 836, "the defense of double patenting as to '328 cannot be predicated upon the claims of said reissue patents." Judge Rich has correctly pointed out for his Court that if

" * * * only one inventive concept is present, two patents cannot properly be granted, regardless * * * of the order in which the applications were filed or the claims presented." Application of Ockert, 1957, 245 F.2d 467, 469, 44 C.C.P.A. 1024; see also Application of Russell, 1956, 239 F.2d 387, 388, 44 C.C.P.A. 716. Likewise, the Trial Judge's finding that "no single claim of either of the reissue patents is *identically worded* with either claim in suit" of 353 is inapt. But the Court's findings as a whole in the light of the running advocacy of the trial and the great preoccupation by experts, pro and con, on identity or non-identity convinces us that the Trial Judge understood the problem, applied correct principles, and reached results which were warranted.

■■ In this matching process as to 328, we start with the fact that the Infringers concede "that the claims of the '328 patent are actually broader in scope than were the claims of the expired patent"[12] thus suggesting, at least, that they are directed to a different combination of elements. Likewise, an examination reveals that despite the presence of many common elements in these combinations, a number of them are not found in the claims of 328 that are disclosed in claims of RE 836.[13] The con-

9. Lapsing into familiar claim jargon, that text points out: "Therefore the rule for ascertaining the identity or the non-identity of the invention or inventions of a plurality of resembling original patents granted to one inventor, is the same as the rule for ascertaining the identity or non-identity of the invention or inventions of a plurality of resembling original patents granted to a plurality of inventors. And that rule consists in comparing the claims of the patents in question and finding identity or non-identity of invention, according as those claims are found to be co-extensive or not co-extensive." Walker on Patents § 280, p. 1280–81 (Deller's ed. 1937).

10. Cited is Seidman & Horwitz, Patent Office Rules and Practice § 79.28 (1962).

11. We shall, as have the parties on brief and argument, confine discussion to RE 836.

12. See Infringers' brief p. 32.

13. See, e.g., Claim 1, RE 836, which discloses the elements, not found in 328, of "a plurality of vertically swinging ground engaging skids pivotally connected * * *" and "a pair of burners carried by said skids * * *" and a "lifting mechanism operative to swing said skids and burners substantially vertically * * *."

Likewise, as to Claim 2, RE 836, "a plurality of vertically swinging ground engaging skids pivotally connected" and "said skids having free rising and falling movement relatively to the vehicle and to each other in passing over uneven ground * * *" and "lifting mechanism operative to lift said skids and burners to inoperative positions."

trast is even more marked in comparing elements found in claims of 353, but nowhere disclosed in RE 836.[14] Whether these various combinations of elements were the same, or whether they were significantly distinct depended essentially on factual evaluation. Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 348, 117 USPQ 236. In the resolution thereof, the Trial Judge was not—as the brief of infringers urges by repeated emphasis on his testimony—compelled to accept the views expressed by the patent-engineer-lawyer expert whose opinions and testimonial demeanor reflected by even this cold bare record afforded ample basis for credibility choices. This sort of an attack "does not reckon with the principles behind F.R.Civ.P. 52(a) which commits to trial judges, not us, the important and frequently decisive role of fact finding." Hughes Tool Co. v. Varel Mfg. Co., 1964, 336 F.2d 61, 62, 142 USPQ 407.

Of course, the principle of double patenting applies to Patent Office proceedings in the most inexorable and immediate fashion. Considering the fact that 353 contains at the very outset detailed references to all of the preceding applications (see notes 6 and 7), and 328 was issued only at the end of the long, tortuous, slow trail, the Patent Office inescapably had to conclude that no double patenting was present. If the statutory presumption (35 U.S.C.A. § 282) is ever applicable, it surely ought to be so in this context. Whatever doubts there might be as to the year-or-so extension of 328 beyond the expiration dates of RE 803 and RE 836 (see note 6), the Patent Office must have concluded that the Patentee would fail to obtain the statutory 17-year protection for the inventions disclosed for the first time in 1949 in 353 where the Patentee limited to the expiration dates of the reissued and now expired patents. For ample reasons, the District Judge agreed. That is the end of it.

■ Like considerations compel an affirmance of the District Court's findings of fact on the defense of " * * * public use or * * * sale in this country, more than one year prior to the date of the application" of the patents. 35 U.S. C.A. § 102(b). This is especially so in the face of the burden which requires that "the proof sustaining it must be clear, satisfactory and, by some it is said beyond a reasonable doubt * * *." Inglett & Co., Inc. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 346, 117 USPQ 236; Coffin v. Ogden, 1874, 18

---

14. See, e.g., Claim 14, 353, disclosing "a transversely extending draft member" and "a draft arm extending from each of said skids and having draft connection with said transverse draft member" with "means associated with said draft arms enabling said skids to rise and fall vertically" and "an articulated joint in each of said draft arms permitting said skids to swing sidewise ⁂ in traveling along the ground."

Claim 16 of 353 "a draft arm extending from each skid to said draft bar" and "means pivotally connecting the front end of each draft arm with said draft bar for swinging movement around substantially horizontal axis" and "means pivotally connecting the rear end of each draft arm with its respective skid for pivotal movement ⁂."

Claim 17, 353, "a draft arm extending from each skid to said draft bar" and "means connected with said draft arms for transmitting lifting movement to said draft arms for raising all of said skids to inoperative positions" and "pivotal connections between each draft arm and its respective skid permitting said skid to swing vertically relatively to its draft arm" and "cooperating stop means carried by each draft arm and its respective skid for limiting the range of swinging movement * * * when the rigs are raised to their inoperative positions."

Claim 11, 353, with respect to the plurality of skids, they are to be "pivotally connected with said draft bar so as to be individually capable of rising and falling movement relatively thereto" with a "means interconnected with said draft bar for transmitting rocking movement" and "lifter means actuated by such rocking movement for lifting said skids * * * to inoperative positions."

Wall. 120, 85 U.S. 120, 124, 21 L.Ed. 821.

The prior use against 328 was the so-called Douglas Weed Burner apparatus indicated on Exhibit L. This was, to be sure, some fascinating folklore involving, among other things, development of new methods for dynamiting rock to build a new hotel in Pittsburgh in 1929, construction of dog race tracks and Partin's learning through construction contractor Douglas how he and some of his well placed hobby farmers were burning off weeds. The Trial Judge did not have to discredit the straight forward and quite disinterested Douglas to reject this apparatus as significant. Even Partin, the promoter and here the Infringer, could not point out from the drawing the use or function of some of its parts or how or in what manner some of it was to function. So far as Partin's testimony about his efforts from 1930 to 1939 (and perhaps up into 1940–43) to get someone in Tennessee or Mississippi to exploit this device commercially is concerned, the result is no different. The record is neither so cold nor bare that it prevents us from seeing the testimonial demeanor of Partin which more than justified the trier in rejecting this obviously interested story, not necessarily because it was consciously untrue, but because it lacked the requisite intrinsic strength and corroboration demanded by the patent law to show prior public use or sale.

As to 353, the critical date was April 30, 1944, a year prior to the application (see note 6, supra).

The trial court was clearly justified in rejecting the Douglas drawing Exhibit L and Partin's testimony on that structure so far as it bore on 353. A considerable body of other prior use evidence was of a documentary, non-oral type, and to that extent it had its usual persuasiveness even under the severe standard of proof required.

This evidence included photographs of the machines built and sold by Patentee's licensee Thompson Machinery Company [15] about 1942. Others were photographs of the cultivation experiments conducted at the Stoneville Agricultural Experiment Station of Mississippi State College during the summer of 1943.[16] There was also a photograph of the improved flame cultivator constructed about October 1943 for use in the 1944 experiments.[17]

The Patentee does not seek to evade these photographs. Indeed, practically all of this information was put forward in the Patentee's affirmative case.

The Patentee recognizes, as he must, that as to the existence of these machines, the Infringers met the burden of proving time, i. e., antedating the critical one-year period. But since it is the invention disclosed by 353 which must have been used, the Court, correctly applying legal principles, had ample basis in the evidence, both factual and expert, upon which to conclude that no one of these pre-April-1944 machines revealed the combination of elements comprising the patented invention.[18]

In many ways this is more or less a repetition of the problem dealt with in analyzing double patenting. There were, as we have seen, in many of the succession of patents (note 6, supra) many elements in common. But in comparing combinations of elements, there

---

15. See photographs PX 4 sometimes erroneously referred to in the briefs as PX 6.

16. Figures 1 and 2 in PX 25, the Bulletin reporting on the experiments.

17. Figure 3 in PX 25, see note 16, supra; also shown in other articles from trade journals.

18. 35 U.S.C.A. § 102(b); see Walker on Patents §§ 49, 82, 83, 84, 87, 63, 717 (Deller ed. 1937); Deller's Walker on Patents §§ 59, 65, 76, 78, 80, 81 (2d ed. 1964).

were patentable distinctions. So it was here with the pre-April-1944 machines portrayed in the photographs, one of the most notable omissions being that of the rotary bar lifting mechanism of the kind claimed in 353. Identity of the invention disclosed in the patent and that revealed from known public use is primarily a factual question. When, as infrequently done, it is tried by a jury, it ends with the jury verdict, Bischoff v. Wethered, 1869, 9 Wall. 812, 76 U.S. 812, 814, 19 L.Ed. 829, and when, more frequently, it is tried to the Judge, it comes with the insulation of F.R.Civ.P. 52(a).

That leaves only the question of whether the Finklea machines which clearly infringe 353 were sold by him prior to the critical April 1944 date. As with the Infringer Partin and the patent-engineer expert witness, there is adequate basis demonstrated in this record for disregarding Finklea's testimony and its extravagant claims about his 1940–1945 activities. Not the least of this is documentary proof from his own 1947 advertisements in which, in the plainest of terms, he calls attention to the trade of his manufacture and sale for the "past two years" of his flame cultivator. This coincides with other uncontradicted proof that in the year 1945 the Patentee, together with his principal licensee, having learned that Finklea and Partin were engaged in manufacturing flame culti-

vators called on each of them, acquainted them with the existence of the patents and the contention of infringement. Likewise, when the testimony of Gotcher and Robertson is considered in the light of facts reflected in the 284-page file wrapper of 328 establishing that the machines portrayed in the Stonewall Experiment Station brochure (notes 16 and 17, supra) were sent to Detroit in November 1944 for engineering study, and this culminated in the preparation and publication of the March 10, 1945 service manual for the "Sizz Weeder" which in turn included the principal drawing [19] for the 353 application which was shortly to be filed,[20] the trial court was not compelled to read Gault's testimony with the literalism urged by the Infringers. Another credibility factor reflecting considerably on Finklea's story was the post-1945 dates welded [21] right on the high-pressure-liquid-hydrocarbon fuel tanks of the cultivators found on the Hebron farm and to which Finklea testimonially pointed as pre-1944 machines sold by him. In short, it was a swearing match as to time and particular machine, and the Court found against the Infringers' version. There it ends.

With this out of the way,[22] infringement was clear and flagrant and the decree for injunction and accounting was correct.[23]

Affirmed.

19. In the service manual it was marked "assembly showing parts location" and was an exact reproduction of what appears in Fig. 1 in 353.

20. Application for 353 was filed April 30, 1945, see note 6, supra.

21. This is required under Mississippi law.

22. In reaching our decision as to each attack, we have considered, but reject, the Infringers' contentions as to the prior art and certain patent references.

23. As an inconsequential tag end in a footnote, page 45 of the brief, the Infringers

complain of a finding of infringement on Claims 3 and 7 of 328 because of the absence of evidence tending to show that the burners on the Infringers' cultivators were "of the high pressure type operating at pressures up to approximately 50 lbs. per square inch." As the case is remanded for accounting, etc., the Trial Court is authorized to consider this matter further and adapt the decree accordingly. Presumably, the Judge concluded that with the use of LPG high pressure fuel tanks, the burners were also high pressure.