**FULLER COMPANY, Plaintiff,**

v.

**METAL ARTS COMPANY, Defendant.**

**Civ. A. No. 64–H–164.**

United States District Court
S. D. Texas,
Houston Division.

May 9, 1966.

---

8. See note 7 supra.

Baker, Botts, Shepherd & Coates, James G. Ulmer, Houston, Tex., for plaintiff.

Fulbright, Crooker, Freeman, Bates & Jaworski, Jefferson D. Giller, Houston, Tex., for defendant.

## FINDINGS OF FACT

INGRAHAM, District Judge.

1. This is a suit for the infringement of claims 1 and 2, being all of the claims, United States Letters Patent 2,784,038, entitled "Means for Pneumatically Conveying Plastic Particulate Material". The patent in suit was issued on March 5, 1957, on an application for patent filed by George Schneider on January 11, 1956.

2. Plaintiff, Fuller Company, a corporation of Delaware, is the owner of the entire right, title and interest in and to the Schneider patent.

3. Defendant, Metal Arts Company, is a corporation of Texas having its principal place of business in Houston, Texas.

4. The invention of the Schneider patent relates to the field of low-pressure pneumatic conveying. Pneumatic conveying systems are used for the transportation of various types of particulate materials, and generally at least include the combination of a conduit through which air is moved, a fan or blower to move air through the conduit, and suitable means for feeding the material to be conveyed into the conduit. The material thus introduced is carried by the airstream through the conduit to a discharge point.

5. The patent in suit is concerned with the problem of "skinning", that is, the formation of what are known in the industry as "streamers", "ribbons", "snake skin", "rats nests" or "angel hair". This phenomenon occurs when particles of certain types of plastics, such as some kinds of polyethylene, polypropylene, nylon, and the like, are conveyed in a pneumatic conveying system. The particles of plastic come into sliding contact with the interior wall of the conveyor conduit, leaving smears of plastic thereon. The kinetic energy of the moving particles is converted partly into heat because of this sliding contact with the walls, and the heat tends to melt succeeding smears together to form long streamers, sometimes reaching six feet (6′) in length. These streamers then peel off the wall and are carried through the conduit, sometimes as loose balls, along with the particles of plastic being conveyed.

6. The formation of streamers or ribbons in the pneumatic conveying of particles of certain plastics is a serious problem, as these streamers tend to foul the injection molding and extrusion machines in which the conveyed particles of plastic are to be used, and to cause imperfections in the end products. If the same conveying system is used subsequently to convey plastic pellets of a different color or type, streamers of the color or type of plastic previously conveyed are likely to contaminate the color or purity of the later material.

7. In the years immediately prior to 1956, as polyethylene and other types of plastics subject to skinning came into widespread use, efforts were made to solve the problem of skinning by making the interior of the conveyor conduit more smooth. Efforts also were made to avoid skinning by adjusting the velocity of the conveying airstream, by grounding the conveyor pipe to eliminate assumed electrostatic charges, by using soft-walled plastic pipe, and by other means, but none of these efforts was wholly successful. In 1956, the view was widely held in the industry that skinning could be avoided if the interior of the conduit could be made sufficiently smooth, but skinning continued to occur in very smooth conduits under the most favorable conditions of velocity and pressure. A system comprising roughened inner surfaces for elimination of streamer formation would not have been obvious to a person skilled in the art as of the time of the invention.

8. The patent in suit solves the problem of skinning by providing a pneumatic conveyor in which the interior

wall of the conduit includes means for interfering with continuous sliding contact between the particles being conveyed and the interior walls of the conduit, and means for maintaining an abruptly descending velocity gradient between the main body of the airstream and the interior wall. These means consist of a multiplicity of rugae or small peaks distributed compactly on the interior wall. When particles of plastic are being conveyed, the rugae or peaks interfere with the sliding surface contact. The rugae create a drag effect on the edge of the conveyor airstream, thus maintaining an abruptly descending velocity gradient of the airstream spaced between the wall and the main body of the airstream. This velocity gradient causes a corresponding decrease in the velocity of the plastic particles as they approach the wall so that their kinetic energy is lessened before impact. The random peaks upon impact bite into and engage the elastic pellets, and this tends to start the particles spinning so that they roll rather than slide. In this spinning, the kinetic energy of their forward momentum is partly converted into rotational momentum instead of into heat. The peaks, or rugae, also serve their function by engaging the pellets over a smaller contact area, thus reducing the amount of contact with the wall. The net effect is to prevent the formation of streamers.

9. The idea of a pneumatic conveyor having a multiplicity of rugae on its inner wall to inhibit the formation of skins or streamers in the conveying of polyethylene or other materials having the property of skinning was first conceived by George Schneider, the patentee of the patent in suit. This concept was promptly reduced to practice by him through a series of experiments, and a few months later he applied for the patent in suit. Plaintiff has met with a high degree of commercial acceptance in selling pneumatic conveyors of the type covered by the patent, and patented systems have become widely accepted in the industry. Major chemical companies in the United States have taken licenses under the patent.

10. The patent in suit discloses that the multiplicity of rugae are provided by roughening the interior of the conveyor conduit, as by sandblasting, etching, or anodizing. These methods are capable of producing the rugae referred to in the claims and described in the specification and drawings. The subject matter of the claims is fully disclosed and described in the specification and drawings, and one skilled in the art can readily construct an operable patented system from them.

11. Defendant has introduced a number of prior art patents and publications. However, none of these patents or publications were concerned with the problem of skinning, nor do they propose or suggest that a pneumatic conveyor with rugae on the interior wall of the conveyor conduit would solve the problem. Several of them were issued long before the problem of skinning was known. None of them is the same apparatus as that of the patent, and all of them would have to be modified to perform in the way and to achieve the result of Schneider. The modifications which would have been necessary to solve the problem would not have been obvious to one skilled in the art. These things are true of the German reference, patent No. 629,-891, issued May 15, 1936, cited in the patent, the Belgian reference, patent No. 536,238, dated in 1955, the Toulmin reference, patent No. 245,584, issued August 9, 1881, the Hoelzel reference, patent No. 2,834,059, issued May 13, 1958, and the other references cited by the defendant. The references do not anticipate the patent, whether considered singly or together.

12. The defendant attempted to show prior public use of the invention at a Monsanto Chemical Company plant in Connecticut, but the evidence on this subject was in conflict at most points and was not satisfactory. The evidence is confusing as to what types of conduit were in use on the various machines at material times, as to whether streamers were or were not formed, as to whether the particular molding apparatus used

would digest streamers if they had been formed, as to whether the material conveyed was of a nature that would account for any absence of streamers, and on other matters. I find that the defendant has failed to establish prior public use, knowledge, or anticipation of the patent at Monsanto or anywhere else.

13. The defendant attempted to show prior public use of the invention in the form of the experimental machine upon which Mr. Schneider performed his experiments which lead to the invention. I find that this apparatus was not the same as the patented apparatus, and that the invention is not anticipated by it nor obvious to one skilled in the art in the light of it. Its use was experimental, and it was not used commercially or placed on sale. I further find that the invention was not anticipated by diverter valves alleged by the defendant. I further find that the invention was not anticipated by pneumatic conveyors which included conduit of ordinary black iron (steel), cast iron, galvanized sheet iron, stainless steel, aluminum, or flexible metal hose.

14. At the time of the issuance of the Schneider patent Mr. Don E. Perkins, who is now defendant's Vice President in charge of defendant's Pneumatic Handling Division, was employed by Dracco Corporation, predecessor of plaintiff's Dracco Division, as an engineer, and worked under Mr. Schneider on the design of pneumatic conveying systems. Mr. Perkins knew that the patent in suit had issued on Mr. Schneider's invention, and knew that pneumatic conveying systems for polyethylene, having a conduit whose interior was roughened by sandblasting to prevent skinning, were the subject of the patent. While Mr. Perkins was still employed by the plaintiff, he wrote to Monsanto Chemical Company in Texas City, Texas, stating that Dracco had a patent on such systems.

15. While Mr. Perkins was employed by plaintiff, he met in 1961 at Los Angeles, California, with Mr. Robert W. Milner, Jr., of Houston, Texas, who is the principal stockholder and manager of defendant, Metal Arts Company, and explored the possibility of his leaving the plaintiff and going to work for defendant. Prior to this time defendant had not been in the pneumatic conveying business, but after Perkins went to work for defendant it did enter this field with Perkins in charge of that activity. Prior to its entry into the field of pneumatic conveyors, defendant had sandblasted pipe under contract for the plaintiff for use in patented pneumatic conveyors to be sold by plaintiff. In connection with this work, plaintiff furnished defendant with a specimen of sandblasted pipe as a control.

16. In 1963, defendant received an order from a customer for a sandblasted pneumatic conveying system. Mr. Perkins discussed the Schneider patent with Mr. Milner, and it was decided by them that defendant would proceed to manufacture this and subsequent sandblasted systems for conveying polyethylene, the patent notwithstanding.

17. Since that time, defendant has designed, engineered, manufactured and sold in the United States approximately forty sandblasted low-pressure pneumatic conveying systems. Each system is specially designed for its job, and the components are individually chosen and adapted for it. These systems were sold complete but unassembled, but each included sandblasted conduit, means to maintain flow of an airstream through the conduit, and means to scatter particles of polyethylene or other material having the property of skinning into the airstream at the intake end of the conduit. The complete patented systems include all blowers, couplings, valves, feeders, conduits, and other components which cooperate in the particular installation to constitute the operating system. In accordance with the patent, the interior of the conduit in these systems was roughened by sandblasting to prevent streamer formation, and these systems were used by the purchasers to convey particles of polyethylene or other material having the property of skinning. Defendant's manufacture and at least

some of the sales of these systems were within this district. These systems were sandblasted in accord with the claims of the Schneider patent, and they are direct copies of it. Among the sales made by defendant were sales of twenty systems which were installed by a customer at its plant in Texas City, Texas; other sales included sales of systems installed by customers in Deer Park, Texas, Belvidere, New Jersey, Parlin, New Jersey, and Whiting, Indiana.

18. In the sale of such systems, defendant assists customers in laying out the components at the job site and in the initial start up and running of the system. Mr. Perkins on two occasions assisted customers in this way, those jobs being at Belvidere, New Jersey, and Covington, Virginia.

19. Defendant also has sold to customers conduit having an interior sandblasted in accordance with the Schneider patent for the purpose of preventing streamers in pneumatic conveying systems. This conduit was sold by defendant knowing that it was to be incorporated into pneumatic conveying systems for conveying particles of polyethylene or other materials having the property of skinning, and the conduit was specially cut and designed to fit the particular system into which it was to be installed. One such sale was to a customer at South Charleston, West Virginia. Such sandblasted conduit is not a staple article of commerce, and is not suitable for purposes other than for installation in the particular pneumatic conveying system for which it was designed and fitted. It is not suitable for substantial non-infringing use. The defendant has induced and contributed to the making and use by others in the United States of pneumatic conveying systems which are within the claims of the patent in suit.

20. Defendant's manufacture and sale of sandblasted pneumatic conveying systems for polyethylene and other materials having the property of skinning, and of sandblasted conduit designed and cut for use in such systems, constituted direct copying of the claims of the patent

and was undertaken by defendant with knowledge of the Schneider patent and in disregard of it. However, findings as to whether these activities render the infringement willful and deliberate will, because of prevailing procedure, await the accounting and final judgment, at which time the determination can be made as to whether the damages shall be increased up to three times and as to whether attorneys' fees shall be allowed to the plaintiff. By not making such finding now, I do not mean to foreclose the issue against either party.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of this cause of action.

2. Claims 1 and 2, being all the claims, of United States Letters Patent No. 2,784,038, are not anticipated by the prior art, and are valid.

3. The subject matter as a whole of the invention defined in claims 1 and 2 of the patent in suit would not have been obvious at the time the invention was made to one having ordinary skill in the art of pneumatic conveying.

4. The defendant has not shown by clear and satisfactory evidence that the invention of the patent in suit was anticipated by any prior public use or sale. Washburn & Moen Mfg. Co. v. Beat'Em All Barbed-Wire Co., 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892); Southern Implement Mfg. Co. v. McLemore, 350 F.2d 244, 249 (C.A. 5, 1965).

5. Claims 1 and 2 express the novel concept constituting the invention, and such concept is set forth in terms of a combination of elements and their cooperative physical relationship. The specification and claims comply with the requirements of 35 U.S.C. § 112.

6. Within the six years prior to the filing of the complaint defendant has directly and contributorily infringed the patent in suit and has actively induced infringement of the patent in suit, by making and selling, within the United States, pneumatic conveyors of the type

described in claims 1 and 2 of the patent; by making and selling, within the United States, conduit having its interior roughened by sandblasting in accordance with claims 1 and 2 of the patent in suit, knowing such conduit to be especially made or especially adapted for use in the United States in pneumatic conveyors of the type described in claims 1 and 2 of the patent, such conduit not being a staple article of commerce suitable for substantial non-infringing use and being a material part of the invention of the patent in suit; and by designing, engineering, manufacturing, selling, and assisting purchasers and users in the laying out at the job site, and in the starting up and running, of pneumatic conveyors of the type described in claims 1 and 2 of the patent, all of such activities being within the United States.

7. The defendant has had actual knowledge of the patent in suit since prior to its activities set forth in the preceding paragraph, and has had actual notice of infringement since the filing of the complaint in this case.

8. The defendant has not established that the plaintiff has improperly extended its patent monopoly, and I conclude that there is no misuse of the patent by the plaintiff.

9. Plaintiff is entitled to recover its damages.