The AMERICAN MONORAIL COM-
PANY, Appellant,

v.

PARKS-CRAMER COMPANY,
Appellee.

No. 7398.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1957.

Decided May 27, 1957.

B. D. Watts, Cleveland, Ohio (Craighill, Rendleman & Kennedy, J. B. Craighill, Charlotte, N. C., Richey, Watts, Edgerton & McNenny, and F. O. Richey, Cleveland, Ohio, on brief), for appellant.

Joseph W. Grier, Jr., Charlotte, N. C. (Taliaferro, Grier, Parker & Poe, Sydnor Thompson, Charlotte, N. C., Porter, Chittick & Russell, and Cedric W. Porter, Boston, Mass., on brief), for appellee.

Before SOPER and SOBELOFF, Circuit Judges, and PAUL, District Judge.

SOBELOFF, Circuit Judge.

In suit here is a patent relating to an improvement in traveling fans or cleaners installed principally in textile factories to blow lint from spinning and weaving machines and from yarns and fabrics during the manufacturing process. The plaintiff, Parks-Cramer Company, is the owner of patent No. 2,524,797, issued to it on October 10, 1950, as assignee of the inventor, Grover B. Holtzclaw, its research director.[1] The District Court

1. The claim of the patent with which we particularly concerned is No. 6, as follows: "The combination with a traveling cleaner, for blowing lint, dust, and other foreign particles from longitudinally alined machines having a trackway disposed above and longitudinally centrally of said machines, said cleaner having a motor driven carriage and fan with means operable by said motor for propelling the carriage along the trackway and for rotating said fan, and a fan casing enclosing the fan having an inlet and oppositely positioned outlet conduits, of the construction in which the said conduits present a rigid section terminating above the heads of the machine operators when standing, and in which the said conduits at each side are provided with a cuff of highly flexible material extending therefrom toward the machines to enable currents of air produced by the

**740**

having upheld the plaintiff's contentions on validity and infringement (147 F. Supp. 218), the defendant, The American Mono-Rail Company, brings the case here on appeal.

A long-standing problem in the textile industry was that in spinning yarn and weaving it into fabric, minute particles of fibre, called lint, would accumulate on the machines and on the material being processed. This interfered with the proper operation of the machines and caused defects in the product. Various means were employed at different times to remove lint. Before 1925, it was done largely by hand; operators of the spinning or weaving machines would pick off the lint or wipe or brush off the surfaces where it had accumulated. Another but still comparatively primitive method was to pipe compressed air into the spinning room. Attached to the pipe was a long, flexible hose with a nozzle on the end, which the spinning machine operator directed as required. Like the original hand method, this consumed much of the operator's time and was not satisfactory. Later came mechanical cleaners—fans or blowers propelled along tracks suspended from the ceiling or otherwise fixed above the spinning machines. The fan is enclosed in a casing or housing with outlets for the air current. These are now an established feature of cotton mills.

A spinning machine consists of a long base resting on the floor and extending the length of the spinning room. Above are three interspaced boards or shelves, running the length of the base. These are known as creel boards, and they support the bobbins of roving or raw fibre, and the spindles. The boards, together with the equipment they hold, are referred to as the creel, when it is desired to distinguish this part of the machine from the lower part, which is often called the underframe.

Spinning machines are usually arranged in a series of rows, with aisles between the rows. In the aisles, operators pass frequently in attending the machines. The blower mechanism on the overhead trackway travels the length of the machine slowly and continuously to blow away the lint. But even after the introduction of this overhead apparatus, it remained a problem to get the air in proper volume and intensity between the creel boards, to clean their undersurfaces; and especially the underframe areas were not satisfactorily cleaned by such mechanisms. It still remained necessary to do considerable cleaning by hand.

Conduits of various design, attached to the fan housing, were in use from time to time to direct air currents in the removal of lint from the machines. Holtzclaw's patent application explains that "in usual traveling cleaners, the end of each air conduit extending from the fan casing is provided with two preferably adjustable sleeves or nozzles, one of which directs the blast of air downwardly by the side of the machine therebeneath and the other of which directs the air transversely across the machine." In describing the problem to which he addressed himself, Holtzclaw says: "Each of the sleeves or nozzles usually terminates above the top of the machine and is ineffective in satisfactorily preventing deposition or accumulation of lint and the like upon rigid parts of the machines not located in the direct paths of the blasts of air, or upon mechanism for the material being treated located closely therebeneath. For example, in the use of the traveling cleaner for cleaning a spinning frame, blasts of air are not fully effective in preventing accumulation of lint and the like upon the lower face of the creel board and upon the spools of roving located closely therebeneath and the deposition or accumulation of bunches of lint upon the roving running from said spools."

His specially declared aim was to provide the well known overhead blower fan and discharged through the cuffs to be directed against the machines and the cuffs to yield upon impingement with an operator or other obstruction in their path of travel."

type of cleaner, with a nozzle, sleeve, or cuff that would reach down lower than a man's height, and thereby more effectively prevent the accumulation of lint on the underside of the creel board and on the spools. He undertook to do so with a "highly flexible" cuff which would yield on contact with an obstruction. Previously, such extensions of the conduit or arm were not allowed to go below the normal height of a person standing in the aisle, for although the fan usually traveled at a speed of only one hundred feet per minute, it was deemed unsafe or otherwise undesirable for a part made of rigid material to extend low enough to strike an operator.

The issue is whether, according to applicable legal standards, this is a patentable invention. We conclude that it is not.

The bare idea of using a soft sleeve or pipe to convey air, fluids, or other materials is very old and has been applied many times. Repeatedly it has been held that the use of known devices in an analogous field is not invention. In a not too dissimilar context, the Supreme Court said that such adaptations are "but the display of the expected skill of the calling and involve only the exercise of the ordinary faculties of reasoning * * *." Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222. The patent which was there held invalid was for an apparatus to raise wet concrete at one place in a building under construction and distribute it through spouts to other parts of the building. The Court pointed to the familiar use of similar methods and appliances to distribute water and other mobile substances, such as grain and coal. The arrangement provided by Holtzclaw, which adapts to a particular use the well known flexible pipe, is no more novel than the adaptation effected in the Gomery case. The use of flexible pipes is a familiar commonplace, and not only to engineers. Indeed, any layman who has ever lifted the hood of his automobile will not have failed to notice the use of flexible pipes or tubes connected with rigid conveyors of fluids and gases. Holtzclaw himself testified that he was familiar with the use of a flexible hose attached to a rigid pipe through which fluids or air or sand was passed. As he said, "You can see that at home or anywhere."

■ Without minimizing the usefulness of Holtzclaw's device, it is still true that not every idea that may be interesting and useful rises to the level of invention. Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 4 Cir., 192 F.2d 270. Many progressive ideas in business and industry are not patentable. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 1953, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

The commercial success of the plaintiff's product has been heavily stressed, but we do not think that it can aid the patent in this case.

■ Commercial success is not a substitute for invention. It may be invoked to aid a patent only if the question of invention is doubtful. In the Great A. & P. case, above cited, the alleged invention consisted of a three-sided frame, with no top or bottom, which, when pushed or pulled across a store counter, moved the articles deposited within it by a customer to the checking clerk and left them there when it was pushed back to repeat the operation. The device worked as claimed, speeded the customer, and saved checking costs for the merchant. Indisputably, it had a quick and widespread commercial success, but it was held unpatentable for lack of invention.

Each patent case in which the issue of invention is raised presents a separate problem, and it is difficult to find a sure guide in any prior decision. Nevertheless, we must endeavor as best we may to derive from the adjudicated cases a general principle with respect to the question of invention. In our view, prior decisions illustrative of the general principle indicate the absence of invention here. In Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438, for example, the patentee devised a complicated piece

of machinery, consisting of a specially designed propeller-like means for dredging rivers, and devices for flooding compartments of a boat at will for the purpose of sinking it to the desired draught of water, and with pumps to remove the mud dislodged from the river bottom. In denying patentability, the Court, 107 U.S. at page 199, 2 S.Ct. at page 231, said:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention."

If the patent for the dredge-boat in that case was invalid, it is difficult to imagine how the flexible cuff here can survive the test of novelty and invention.

■ Not unmindful of the rule which requires us not to disturb the District Judge's findings of fact unless they are clearly erroneous, we have given his findings deferential consideration. Rule 52 (a.) Federal Rules of Civil Procedure, 28 U.S.C.A. We must, however, conclude that he fell into error in attributing decisive weight to commercial success. Moreover, the appropriate standard of invention is a legal, rather than a factual, question. We think that, for the lack of invention, the patent should not have been granted in the Patent Office or sustained in the District Court.

Decree reversed with costs.