**WILCOX MANUFACTURING COM-
PANY, Plaintiff,**

v.

**EASTERN GAS AND FUEL ASSO-
CIATES, Defendant.**

**JEFFREY GALION MANUFACTURING
COMPANY, Plaintiff,**

v.

**WILCOX MANUFACTURING COM-
PANY, Defendant.**

Civ. A. Nos. 2544, 2721.

United States District Court
S. D. West Virginia,
Charleston Division.

July 26, 1967.

John M. Webb, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., and Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for Jeffrey Galion Mfg. Co. and Eastern Gas and Fuel Associates.

John W. Malley, Cushman, Darby & Cushman, Washington, D. C., and Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., for Wilcox Mfg. Co.

## OPINION

FIELD, Chief Judge.

Civil Action No. 2544 is an action for alleged infringement of United States Letters Patent No. 2,967,701, which issued January 10, 1961, and United States Letters Patent No. 3,026,098, which issued March 20, 1962. The plaintiff is Wilcox Manufacturing Company (hereinafter referred to as "Wilcox"), a West Virginia corporation, having its principal place of business in Raleigh, West Virginia. The defendant is Eastern Gas and Fuel Associates (hereinafter referred to as "Eastern"), a Massachusetts corporation, having regular and established places of business at Kopperstown and Barrett, West Virginia.

Civil Action No. 2721 is an action for a declaratory judgment that United States Letters Patent Nos. 2,967,701 and 3,026,098 are invalid and have not been infringed. The defendant asserted a counterclaim for alleged infringement of Patent No. 3,026,098. The plaintiff in Civil Action No. 2721 is Jeffrey Galion Manufacturing Company, an Ohio corporation, having its principal place of business at Columbus, Ohio. The Jeffrey Manufacturing Company is a division of Jeffrey Galion Manufacturing Company. Both will be referred to hereinafter as "Jeffrey." The defendant in Civil Action No. 2721 is Wilcox.

Jurisdiction over the parties and the subject matter of Civil Action No. 2544 is founded upon 28 U.S.C.A. § 1338(a) and is not disputed. Jurisdiction over the parties and subject matter of Civil Action No. 2721 is founded upon 28 U.S. C.A. §§ 1332(a), 1338(a), 2201 and 2202 and is not disputed.

The principal issues in both actions are the validity of the Wilcox patents and the alleged infringement of those patent by Jeffrey 100–L miner. Accordingly, the two actions were consolidated for trial.

The two patents involved in this litigation issued on applications filed by Arnold G. Wilcox, and Wilcox Manufacturing Company is the owner of the entire right, title and interest in and to these patents. Patent No. 2,967,701 which covers a method of mining, issued on an application filed June 30, 1960, Serial No. 40,014, and Patent No. 3,026,098 which covers a mining machine issued on an application filed May 8, 1961, Serial No. 108,371. Both of these applications were based on a prior application filed May 6, 1957, Serial No. 657,160, which is alleged by Wilcox to be a continuation-in-part of Wilcox application Serial No. 449,851, filed August 16, 1954.

Jeffrey and Eastern contend that Wilcox Patent No. 3,026,098 is invalid for the following reasons:

(1) The apparatus which the patent purports to cover was obvious to those skilled in the art at the time of the alleged invention, and therefore the patent lacks invention under 35 U.S.C.A. § 103.

(2) The claims contended for in this litigation by Wilcox are broader than any

invention disclosed in the patent, and therefore the patent is invalid for over-claiming.

(3) The apparatus which Wilcox contends is covered by the claims of the patent was in public use and on sale more than one year prior to the assertion of claims covering that apparatus.

These parties also challenge the validity of the Method Patent No. 2,967,701 for the following reasons:

(1) The method which the patent purports to cover was obvious to those skilled in the art at the time of the alleged invention and accordingly the patent lacks invention as required by 35 U.S.C.A. § 103.

(2) The claim of this patent purportedly covers merely the method of using the apparatus shown in the patent and therefore is invalid and improper as a method claim.

(3) The specification does not describe an operative method of mining and accordingly the patent is invalid for failure to contain a description of the invention in such terms as to enable any persons skilled in the art to practice it as required by 35 U.S.C.A. § 112.

Additionally, it is charged that foreign applications were filed with respect to both of the patents which included subject matter that had been filed in the United States Patent Office less than six months prior to the filing of the foreign applications and accordingly the patents are invalid under 35 U.S.C.A. § 185.

While both of the Wilcox patents are in issue in these actions, disposition depends primarily on the question of validity of the apparatus patent No. 3,026,098. The first Wilcox application No. 449,851 which was filed on August 16, 1954, states that the invention relates to mining machines of the continuous type, and that it is particularly adapted for use in mines having a relatively low face. The specification describes the machine as comprised of a frame carrying a power plant and conveyor and having a pair of cutting and conveying helical augers disposed forwardly of the frame which augers are horizontally spaced from each other, rotating in opposite directions, longitudinally reciprocated and vertically adjustable.

The machine is designed so that it can be "sumped in" to the face of the coal, and then moved transversely across the face, cutting the coal to the height of the vein, and continuously conveying the coal so cut outwardly to a point to the rear of the machine where it can be picked up and further conveyed by other auxiliary equipment. At the end of one traverse the machine may be again "sumped in" and another transverse cut made along the face of the coal in the opposite direction. The maximum vertical dimensions of the frame are less than the vertical dimension of the cutting augers and, accordingly, the opening cut by the augers is high enough to accommodate the entire machine as the room is developed.

Incident to this first application, Wilcox took the position that he was the first to provide a cutter with the combination of (1) rotation, (2) reciprocation and (3) vertical adjustment. Since it bears vitally on both the question of obviousness and infringement, I think it appropriate to refer to the following excerpts from the specification which appear in the initial application as well as the patent No. 3,026,098 as it finally issued. The combined rotary and reciprocatory motion of the cutters is described as follows:

"The housing 36 is adapted to carry a suitable means 40 for transmitting the rotary motion of the power plant to the cutting means 14 so as to selectively reciprocate the latter longitudinally. While the means 40 may take many forms, a preferred embodiment is shown in detail in Figures 5 and 6. As shown, a main shaft 42 is drivingly connected with the power plant 16, through a suitable clutch mechanism 44, and has its rear end splined, as at 46, so that it may reciprocate axially therein.

\*      \*      \*      \*      \*      \*

"It will be seen that when the stub shaft 52 is rotated that the cam 62 and follower 66 will cause the transmission housings 36 and 38 to longitudinally reciprocate with respect to the main frame and power plant."

Similarly, the operation of the machine refers to this combined rotary and reciprocating motion:

"During this sumping operation, the clutch linkage 60 is actuated to disengage the clutch teeth 54 and 56 so that the cutting augers will not be reciprocated longitudinally.

\*    \*    \*    \*    \*    \*

"The clutch linkage 16 is then actuated by the operator to bring the clutch teeth 54 and 56 into engagement so that the augers will be longitudinally reciprocated through the main shaft 42, bevelled gears 48 and 50, shaft 52, cam 62 and plate cam follower 64 and 66. In this regard, it is to be understood that since the plate 64 is rigid with the power plant and main frame, the sub-frame 28 and all of the structural elements carried thereby, including housings 36, 38, and 76 will be caused to longitudinally reciprocate. The operator may then actuate the winches 20 to cause the machine to move across the mine face and during this movement the combined rotary and reciprocating motion of the cutter will cause the teeth 108 and 102 to loosen the coal which will then be conveyed rearwardly by the helical blades 96 from where it is conveyed to the rear of the machine by the screw conveyor 112 and endless conveyor 114.

\*    \*    \*    \*    \*    \*

"After the pure coal has been removed and collected as described above, the operator may then selectively raise the augers by actuation of the associated hydraulic ram 90. It is to be noted that during this raising motion the auger is both rotated and reciprocated."

■■ The scope of the Wilcox patent is limited to the invention described in the claims read in the light of the specification, and each of the claims must necessarily be construed in the light of the specification and may not transcend the invention disclosed thereby. See Texas Co. v. Globe Oil & Refining Co. (7th Cir. 1955) 225 F.2d 725. It is also well settled that an invention should be construed not only in the light of the specification and the claims, but also with reference to the file wrapper history in the Patent Office. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545. Since the language of the specification hereinabove quoted appeared in both the original Wilcox application as well as in the apparatus patent which finally issued to him, it is both desirable and necessary in the disposition of this case to review the history of the proceedings in the Patent Office during the seven and one-half years the Wilcox applications were pending therein from the date of the original application in 1954 until the issuance of the patents in March of 1962.

### Patent Office Proceedings

As hereinbefore stated the first application Serial No. 449,851 was filed by Wilcox in the Patent Office on August 16, 1954, the specification in that application containing the details and language hereinbefore quoted. Thirteen claims were filed with the original application, and the first action of the Patent Office was a requirement that the claims be restricted to either the mining machine or the mining head described therein. On March 30, 1956, the Patent Office rejected all of the claims to the mining machine as unpatentable over the prior art and asked for additional disclosure by means of drawings inasmuch as the showing of the drawings of the mountings for the cutter and the means for reciprocation of the cutters was not clear.

By amendment dated May 23, 1956, Wilcox cancelled all the original claims except Claim 11 and added four new claims. All of the claims retained in the application specifically required means for reciprocating the cutters, and Wilcox distinguished the prior art cited by the

Office on the ground that none of the art showed the combination of the three specific motions required by the machine in his application, namely, rotation, reciprocation and vertical adjustment. Indeed, Wilcox admitted that the combination of rotation and vertical adjustment was old, and that rotation together with reciprocation was disclosed by Hurd Patent No. 556,986 and Hess Patent No. 999,996. On July 31, 1956, Wilcox amended the application to include new drawings showing the mounting for the cutters and the means for reciprocating the same. Additionally, Wilcox added a new claim which required only one auger, and asserted that the single auger machine was a part of the same invention and that the number of cutters did not affect the patentability of the machine, the invention residing in the three motions, namely, rotation, reciprocation and vertical adjustability. The Patent Office refused to allow the single auger claim, but did allow five claims directed to the two auger machine, all of which required the three motions heretofore detailed. Wilcox did not pay the final fee and this application was forfeited.

One day before the original application was forfeited, Wilcox filed a continuation-in-part application Serial No. 657,-160 which contained the same disclosures as the original application as amended, and also included an extensive description of a single auger machine. Fifteen claims were filed with this application and were directed to a machine which specifically required the three elements which Wilcox had alleged in his original application. Incident to this application which was filed as of May 15, 1958, Wilcox distinguished his machine from the prior art on the basis of the reciprocatory motion disclosed in the application, and apparently believed and so represented to the Patent Office that reciprocation was essential to the operation of the apparatus, and that without it the auger cutter could not be successfully moved transversely across the mining seam. On October 28, 1958, Wilcox filed a supplemental amendment covering an application for a claim to a process of continuous short wall mining. On December 29, 1958, the Patent Office allowed ten apparatus claims, all of which expressly required reciprocation, but declined to consider the process claim.

On June 29, 1959, more than four years after the original application was filed and more than three years after Wilcox had sold its first mining machine, Wilcox inserted a claim which did not specifically require reciprocation, asserting that a critical bit spacing on the augers was equivalent to reciprocation and could be substituted therefor. There was no disclosure defining this critical bit spacing which was alleged to be the equivalent of reciprocation. A supplemental amendment dated December 9, 1959, was filed, and in an interview the Examiner took the position that claims without reciprocation were broader than the applicant's invention. Wilcox asserted that reciprocation had not merely been eliminated from the claims, but that the language had been broadened to require reciprocation or its equivalent, asserting that without either reciprocation or its equivalent, the claims would cover an inoperative structure. On December 22, 1959, the Patent Office allowed fifteen claims including claims to both single and dual auger machines, but the Examiner refused to allow claims which did not expressly include reciprocation. Subsequently Wilcox filed an amendment cancelling all claims expressly including reciprocation and presenting new claims, all of which contained phraseology which Wilcox asserted required reciprocation or its equivalent.

The Examiner proposed a claim for interference purposes and on June 17, 1960, Wilcox inserted the claim in his application. On July 20 an interference was declared between the Wilcox application and an application of Thomas H. Queer. On March 20, 1961, Wilcox voluntarily cancelled all claims which related to a single auger machine, and on July 9, 1962, the Examiner acted upon the amendments filed by Wilcox. At this time the Wilcox apparatus patent No. 3,-

026,098 had issued and the Examiner rejected all claims in the application as unpatentable over that patent. Thereafter, Wilcox abandoned this application.

Throughout the interference proceeding, Wilcox asserted that the subject count was unpatentable, and that two slight differences, to-wit, reciprocation or its equivalent and vertical adjustment, were the factors which created patentability in the machine of Wilcox. Ultimately Wilcox disclaimed the subject matter of the count, and the count eventually issued as a claim in U. S. Patent No. 3,066,924 issued to Thomas H. Queer.

On May 8, 1961, following the Patent Office action in denying the Wilcox motion to dismiss the interference with Mr. Queer, Wilcox filed a fourth application Serial No. 108,371 alleged to be a division of the 1957 application. The description of the invention was identical with that in the 1957 application and the specification disclosed a machine in which a pair of auger cutters were rotated and longitudinally reciprocated as the machine was drawn transversely across the face of the coal, and which included an improved form of vertical adjustment. There was no disclosure that the machine could operate without longitudinal reciprocation of the cutters. On September 1, 1961, the Examiner rejected all claims in the application, first, because the claims were not related to an independent invention from that claimed in the Wilcox application involved in the interference, and, second, because all claims were unpatentable over the disclosure of the Queer application. It should be noted that the Examiner specifically held that the vertical adjustability of the cutters was an expedient within the skill of the art and that making the cutters of equal diameter and of opposite pitch was a mere matter of engineering choice. Wilcox agreed to cancel all conflicting claims in the application involved in the interference if those claims were allowed in this new application. Following a further interview and supplemental amendment, a rejection by the Examiner on the ground that the claims were indefinite, and a further amendment, the Wilcox apparatus patent No. 3,026,098 finally issued on March 20, 1962.

### The Method Patent

Shortly after the notice of interference was issued by the Patent Office, on June 30, 1960, Wilcox filed a new application Serial No. 40,014 which he claimed was a division of the 1957 application. The description of the alleged invention was susbtantially the same as that contained in the 1957 application, but the specification stated that the invention related to mining methods. The single claim in the application was directed to a method of mining although the specification stated that there had been provided a continuous mining machine. In any event, on September 16, 1960, the Patent Office rejected this claim as fully met by the Hess patent.

Following an interview with the Examiner on October 3, 1960, the application was amended cancelling the original claim and adding two new claims. Claim 2 recited the process in procedural language while Claim 3 recited the process in terms of the manner in which the apparatus described therein was to be used. Claim 2 was rejected by the Examiner while Claim 3 was allowed.

On January 10, 1961, Wilcox Patent No. 2,967,701 issued with one claim, the Claim 3 above referred to, which is directed to the manner in which the apparatus described in the specification is to be used. The claim of this method patent sets forth three operative steps which are (1) sumping [1] in the augers, (2) moving the augers horizontally to cut and convey the coal outwardly and vertically to form the sidewalls, and (3) continuously gathering and conveying the coal.

---

[1]. The term "sump in" as used in the coal industry is apparently of long standing and well defined. It means that by the assistance of a winch, rope and pulleys, the cutting augers may be pushed inwardly against the mine face until they cut to their working depth into the vein of coal.

**40**

### The Prior Art

■ While counsel for Wilcox have in effect conceded that each of the elements contained in the apparatus patent were known and disclosed by the prior art, a brief review of the art as disclosed in the Patent Office antecedent to the Wilcox patent is helpful.[2] Representative of the patents on the subject and a summary of the elements therein is as follows:

Queer United States Patent No. 3,066,-924. This, of course, was the patent involved in the interference with Wilcox in the proceedings in the Patent Office. It clearly teaches a plurality of cutting augers, vertical adjustment, the sumping operation, the transverse movement across the vein of coal to be cut and the simultaneous conveying of the coal.

Anderson United States Patent No. 2-592,996. While this machine was designed for "long wall mining" procedure, it does teach a plurality of horizontally spaced cutting elements, vertical adjustment, transverse cutting of the seam and conveying of the coal.

Walker United States Patent No. 1,-500,352. This patent teaches the plurality of cutting elements, vertical adjustment, the sumping procedure, transverse cutting of the coal and conveying thereof.

Hess United States Patent No. 1,032,-902 and United States Patent No. 1,006,-213. These patents teach the use of an auger as a cutting element, reciprocation of the cutting element, vertical adjustment, the sumping process, the transverse movement across the vein of coal and the conveying thereof.

Hoadley United States Patent No. 1,-040,679. This patent teaches a plurality of cutting elements horizontally spaced with vertical adjustment, the sumping procedure, the transverse cutting of the coal and the conveying thereof.

Kuhn United States Patent No. 1,148,-973. This patent teaches the plurality of cutting augers horizontally spaced, with vertical adjustment, capable of sumping into the face of the coal and cutting of the coal transversely.

### Discussion

■ The Wilcox patents are, of course, entitled to the presumption of validity under 35 U.S.C.A. § 282. This presumption does not, however, relieve the Court of the responsibility of inquiry as to validity. This judicial inquiry in regard to the Wilcox apparatus patent must be made in the light of Mr. Justice Jackson's classic admonition in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. 1950 340 U.S. 147, at 152, 71 S.Ct. 127, at 130, 95 L.Ed. 162:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans."

■ Patentability is dependent upon novelty and utility as defined in 35 U.S.C.A. §§ 101 and 102, and non-obviousness as expressed in the 1952 Act in § 103 as follows:

"§ 103.   *Conditions for patentability; non-obvious subject matter*

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differ-

---

2. Counsel for Wilcox characterized the prior art patents as "merely paper patents" which had no practical impact on the coal industry. However, on the issue of invention this argument of Wilcox was answered by the following observation of Judge Learned Hand in Western States Mach. Co. v. S. S. Hepworth Co. (2nd Cir. 1945) 147 F.2d 345, at 350:

"A patent may have lain for years unheeded, as little a contribution to the sum of knowledge as though it had never existed, an idle gesture long since drifted into oblivion. Nevertheless, it will be as effective to invalidate a new patent, as though it had entered into the very life blood of the industry."

ences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Patentability, especially in the light of § 103 was carefully analyzed in Graham v. John Deere Co., supra (1965). In the course of this analysis Mr. Justice Clark made the following observations (at p. 14 of 383 U.S., at p. 692 of 86 S.Ct.) :

"The section is cast in relatively unambiguous terms. Patentability is to depend, in addition to novelty and utility, upon the 'non-obvious' nature of the 'subject matter sought to be patented' to a person having ordinary skill in the pertinent art."

And at page 17, 86 S.Ct. at page 693 :

"Approached in this light, the § 103 additional condition, when followed realistically, will permit a more practical test of patentability. The emphasis on nonobviousness is one of inquiry, not quality, and, as such, comports with the constitutional strictures.

"While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at 155, 71 S.Ct. at 131, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

The record in the present case indicates clearly that each of the elements of the combination in the Wilcox apparatus patent is old and fully disclosed in the prior art. While undoubtedly the combination was a useful and successful improvement, it does not in my opinion rise to the level of invention. See Interstate Rubber Prod. Corp. v. Radiator Specialty Co. (4th Cir. 1954) 214 F.2d 546; American Monorail Co. v. Parks-Cramer Co. (4th Cir. 1957) 245 F.2d 739. The arrangement of these old elements into a compact and movable machine which could operate in a low-roof mine may have required a high degree of mechanical skill, but did not constitute invention within the meaning of the patent law. See Ranco, Inc. v. Gwynn (6th Cir. 1942) 128 F.2d 437. American Morgan Co. v. Joy Mfg. Co. (D.C.W.D.Pa.1939) 31 F. Supp. 419. The machine produced and marketed by Wilcox enjoyed a high degree of commercial success and this fact was emphasized by counsel for Wilcox throughout the Patent Office proceedings; but commercial success is not the criterion and without invention it will not support patentability. Servo Corp. of America v. General Electric Co. (4th Cir. 1964) 337 F.2d 716; Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc. (4th Cir. 1962) 299 F.2d 793.

In addition to commercial success, as heretofore pointed out, Wilcox consistently urged in the Patent Office that his machine was the first to successfully combine the three elements of rotation, reciprocation and vertical adjustability. However, the concurrent developments in the production and use of the Wilcox machines in the mining industry do not support those representations and, indeed, provide evidence which is fatal to Wilcox's case.

The record indicates that the original mining machines manufactured and sold by Wilcox broadly corresponded to the machines disclosed in the patents involved in this litigation. Those machines had

two horizontally spaced augers which were rotated and reciprocated and which were vertically adjustable. However, the record further shows that since June 6, 1958, Wilcox has sold no machine which contains an oscillator to reciprocate the augers. The record shows that as early as May 21, 1958, Stonega Coal Company, which was using a machine purchased from Wilcox, discovered that in the practical use of the machine reciprocation of the augers could be eliminated and had removed the oscillators from the machine. Since June of 1958, the machines which were sold by Wilcox and a large majority of the machines presently in use do not have such oscillators and do not include reciprocation as a part of the operation of the machine.

As heretofore noted in the review of the Patent Office proceedings, Wilcox apparently recognized that reciprocation was not a necessary element of his invention when on June 29, 1959, he first inserted a claim which did not specifically require reciprocation. The Examiner properly rejected the claims which did not include reciprocation, and in response to Wilcox's contention that "critical bit spacing" was the equivalent of reciprocation in the combination the Examiner made this observation:

"No new or unobvious results are seen in providing the reference with a pair of concentric helical blades. As pointed out by applicant, the pair of blades may have significance in connection with critical spacing of cutting teeth but no such spacing is disclosed or claimed."

In the light of the entire record the Wilcox apparatus patent falls short of validity on three grounds:

*First,* when the element of reciprocation is eliminated from the combination, the residue of the claimed invention should have been clearly obvious to those skilled in the art, and accordingly the patent is invalid for lack of invention under 35 U.S.C.A. § 103. The prior art cited herein anticipates every element of the Wilcox machine, and as stated in Great Atlantic & Pacific Tea Co. v. Su-

permarket Equipment Corp., supra, 340 U.S. at 153, 71 S.Ct. at 130, Wilcox " * * * has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

I might state here that the contention of Wilcox that "critical bit spacing" is the equivalent of reciprocation in the combination is not supported by the record. First of all, nowhere does there appear any definition of this critical spacing; and, second, the record shows that machines which were sold by Wilcox before such critical bit spacing was substituted for reciprocation apparently operated satisfactorily when reciprocation was entirely eliminated by the operator.

*Second,* the Wilcox patent specifically discloses a machine in which reciprocation is a vital element, and any attempt to construe the claims in a manner which does not require reciprocation or its equivalent renders them invalid for overclaiming by purporting to cover a combination not disclosed in the patent. See Schriber-Schroth Co. v. Cleveland Trust Co. (1938) 305 U.S. 47, 59 S.Ct. 8, 82 L.Ed. 34; Plax Corporation v. Precision Extruders, Inc. (3rd Cir. 1957) 239 F.2d 792.

*Third,* assuming that critical bit spacing in the context of the claimed combination does, in fact, exist, as the Examiner pointed out such spacing is neither disclosed nor claimed in the patent, and accordingly Wilcox has failed to satisfy the requirements of 35 U.S.C.A. § 112 which requires a clear and concise description of the invention.

These observations relative to the invalidity of the apparatus patent apply in a large degree to Method Patent No. 2,-967,701. Additionally, however, this method patent falls because the claim sets forth merely the manner in which the apparatus is used. As stated in Chisholm-Ryder Co. v. Buck (4th Cir. 1933) 65 F.2d 735, 736:

"Thus it appears that the method proposed may be performed by the pat-

ented machine; but the evidence fails to indicate how the process may be carried out practicably in any independent fashion, and the result is that the process patent merely states the function or effect of the machine, and is invalid under the established rule."

In view of my conclusions on the issues of validity, it is unnecessary to pass on the question of alleged infringement. However, some brief observations on this issue are pertinent.

First of all, the record clearly shows that Jeffrey, influenced by the success of the Wilcox machine, studiously copied the Wilcox product and placed on the market the Jeffrey 100–L which was to a large degree a duplication of the machine being produced and sold by Wilcox. In the absence of a valid patent by Wilcox, however, Jeffrey was entitled to engage in such competitive conduct. Sears, Roebuck & Co. v. Stiffel Co. (1964) 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661. And even should we assume the validity of the Wilcox Patent No. 3,-026,098 as issued, the Jeffrey machine does not infringe since it omitted one essential element of the Wilcox patent, that is reciprocation or its equivalent. Under these circumstances infringement could not be established. See Entron of Maryland, Inc. v. Jerrold Electronics Corp. (4th Cir. 1961) 295 F.2d 670. Suffice it to say, that the observations with respect to both validity and infringement apply in these cases equally, where appropriate, to Eastern as well as Jeffrey.

### Conclusions of Law

1. This Court has jurisdiction over the parties and the subject matter of Civil Action No. 2544 and Civil Action No. 2721.

2. The Wilcox Patent No. 3,-026,098 is invalid because the subject matter thereof was obvious to those skilled in the art at the time the alleged invention was made. Therefore, the patent is invalid for lack of invention under 35 U.S.C.A. § 103.

3. The Wilcox Patent No. 3,026,098 is invalid because the claims, in the scope contended for here, are broader than any invention disclosed in the patent or any invention made by Mr. Wilcox. The claims of such scope are invalid for overclaiming.

4. The Wilcox Patent No. 2,967,701 is invalid because the method which the patent purports to. cover was obvious to those skilled in the art at the time the alleged invention was made. Therefore, the patent is invalid for lack of invention under 35 U.S.C.A. § 103.

5. The Wilcox Patent No. 2,-967,701 is invalid because the claim of the patent covers merely the method of using the apparatus disclosed in the patent.

6. The Wilcox Patent No. 3,026,098 has not been infringed by Jeffrey. The manufacture, sale and use of the Jeffrey 100–L miner does not infringe Wilcox Patent No. 3,026,098.

7. The Wilcox Patent No. 3,026,098 has not been infringed by Eastern.

8. The Wilcox Patent No. 2,967,701 has not been infringed by Jeffrey. Mining operations carried out with the Jeffrey 100–L miner in accordance with the operating procedures recommended by Jeffrey do not infringe Wilcox Patent No. 2,967,701.

9. The Wilcox Patent No. 2,967,701 has not been infringed by Eastern.

This opinion is being filed in lieu of findings of fact and conclusions of law pursuant to Rule 52 F.R.Civ.P., and counsel may prepare appropriate judgment orders in each case.